THE STATE OF OHIO, APPELLEE, *v.* SIMS, APPELLANT.

(No. 43405—Decided November 19, 1981.)

*Mr. John T. Corrigan,* prosecuting attorney, for appellee.

*Mr. Seymour Gross,* for appellant.

JACKSON, C.J. Appellant Ricardo Sims appeals his convictions for ag-

gravated robbery[1] and attempted murder.[2] Six errors are assigned for review.

The evidence adduced at trial against the accused included the eyewitness testimony of the victim, Georgia Anderson, and circumstantial evidence. Mrs. Anderson testified that at about 6:30 p.m., on March 19, 1979, a man entered the grocery store where she worked as a cashier. He bought a newspaper, walked to the back of the store "looking around," and left. The appellant then entered the store; he was wearing a white stocking over his face, but the stocking did not distort his features. She instantly recognized him because he had patronized the store sixty or seventy times during the three months she had worked there. Besides recognizing the appellant's features, she recognized his voice, his habit of calling her "baby," and his clothing, which included an orange skullcap that he always wore. She stated that on ten or fifteen occasions the appellant had been in the store accompanied by the man who had entered just before the robbery, and that the other man had given her trouble before. Mrs. Anderson said that the lighting in the store was good, and that the appellant was in the store with her during the robbery for three of four minutes. She did not know the appellant's name at the time of the incident, but she did know that he lived in the high rise apartment building near the store.

According to Mrs. Anderson, the appellant walked in the store with a gun and a plastic bag. He ordered her to put the money and the food stamps in the bag. When this was done, he said, "Okay baby, now run." She ran to the back of the store, and was shot in the leg. She fell and began screaming; at that moment, her daughter Belinda came in the door. She told Belinda that she was in the back, that she was okay, and to lock the door. She also told her that she knew who the robber was but that she did not know his name. Mrs. Anderson was hospitalized for twelve weeks with a shattered femur.

Belinda Anderson testified that as she drove up to the store where her mother worked, she saw a person run out the door with a gun in his hand. He ran across a field into the high rise apartment building. She corroborated her mother's testimony that her mother had immediately said she knew the robber.

The police were called to the scene and arrived a few minutes later. After speaking to Belinda Anderson, Officer John Szabo and his partner searched the high rise apartment building. Officer Szabo stated that a man approached them and told them that the suspect was in apartment 7-H. When they first came to the door of the apartment, they heard voices, but when the door was finally opened, they found only a young woman. After noticing that a person could climb to an upstairs apartment from the porch at the rear of the apartment, the police

---

[1] Aggravated robbery is a violation of R.C. 2911.01(A) which provides:

"No person, in attempting or committing a theft offense as defined in section 2913.01 of the Revised Code, or in fleeing immediately after such attempt or offense, shall do either of the following:

"(1) Have a deadly weapon or dangerous ordnance as defined in section 2923.11 of the Revised Code on or about his person or under his control;

"(2) Inflict, or attempt to inflict serious physical harm on another."

[2] The offenses of attempt and murder are defined by R.C. 2923.02 and 2903.02, respectively:

"No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense." R.C. 2923.02(A).

"No person shall purposely cause the death of another." R.C. 2903.02(A).

searched apartments 8-F and 8-H, without success.

Detective Tom Burton testified that he returned to the apartment building three days later. After he had described the man for whom he was searching, a guard gave him the appellant's name; Detective Burton was told that the appellant lived in apartment 8-F. The detective obtained a photograph of the appellant, placed it in an array with five other pictures of black men, twenty-one to twenty-five years old, and showed them to Mrs. Anderson. He told her, "Take your time and try to pick out anybody in there that you say robbed you." She picked the appellant's picture, saying, "That's the male right there." The appellant was arrested the next day.

The appellant testified that he was at his mother's house from 5:30 p.m. to midnight on the evening of the robbery. The state impeached the appellant's testimony by cross-examining him about his prior conviction for receiving stolen property and about the fact that he had jumped bail and fled after a preliminary hearing at which Mrs. Anderson identified him as her assailant.

The defense called a character witness, Michael King, to the stand. Mr. King testified that the appellant had a reputation for truthfulness and non-violence.

The appellant's alibi was corroborated by the only two other adults whom the appellant said were present at his mother's house: his mother Vivian Jones, and her friend Eva Warren. Both Mrs. Jones and Mrs. Warren testified that Mrs. Warren left a few minutes after 7:00 p.m.,[3] to take her sister to the hospital to have a baby. Mrs. Warren testified that it took thirty to thirty-five minutes from the time she left Mrs. Jones' house to the time she arrived at the hospital.

On rebuttal, the state introduced hospital records showing that Mrs. Warren and her sister arrived at the hospital at 6:37 p.m.

For his first assigned error, the appellant contends that the trial court erred when it permitted the prosecutor to ask the character witness, Mr. King, if he had heard that the appellant had been arrested for aggravated robbery and felonious assault of a certain Larry Henry. Mr. King responded that he was aware of those charges. On appeal, appellant states that the prosecutor's question was improper under Evid. R. 404(B),[4] and the decisions of *Wagner* v. *State* (1926), 115 Ohio St. 136, and *State* v. *Cole* (1958), 107 Ohio App. 444 [8 O.O.2d 427]. This court is not persuaded that the foregoing authorities apply to the circumstances in the case at bar.

Evid. R. 404(B) excludes evidence of other bad acts to prove the character of the accused, in order to show that the accused acted in conformity with his character on the occasion of the crime; proof of other bad acts is admissible only to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In the case at bar, however, the evidence of prior arrests was not offered to prove the character of the accused. Both *Wagner* v. *State* and *State* v. *Cole, supra,* forbid the use of prior arrests to impeach a defendant's testimony on cross-examination. The state did not refer to the appellant's prior arrest to impeach *his* testimony. The evidence of prior arrests was offered to impeach Mr. King's testimony that the

---

[3] Mrs. Jones said that Mrs. Warren left "a little bit after seven." Mrs. Warren said she left at "ten after seven."

[4] Evid. R. 404(B) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

appellant had a reputation for non-violence. This line of inquiry is proper under Evid. R. 405(A), which provides:

"In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. *On cross-examination, inquiry is allowable into relevant specific instances of conduct.*" (Emphasis added.)

The fact that the appellant had been arrested for aggravated robbery and felonious assault would necessarily affect his reputation for nonviolence. These instances of misconduct were therefore relevant to the testimony of the character witness, and were admissible to impeach *his* statement that the appellant had a reputation for non-violence. This result would have been reached even prior to the enactment of the Rules of Evidence, under the authority of *State* v. *Elliott* (1971), 25 Ohio St. 2d 249 [54 O.O.2d 371], in which the Ohio Supreme Court held:

"A character witness may be cross-examined as to the existence of reports of particular acts, vices, or associations of the person concerning whom he has testified which are inconsistent with the reputation attributed to him by the witness — not to establish the truth of the facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given his testimony. Such inconsistent testimony tends to show either that the witness is unfamiliar with the reputation concerning which he has testified, or that his standards of what constitutes good repute are unsound." (Paragraph two of syllabus.)

The first assigned error is not well taken.

In the second assignment of error, appellant claims that he should have been permitted to explore, on redirect ex-amination of the character witness, the validity of the other charges pending against the appellant. The appellant states that the refusal of the court to allow such questions constituted prejudicial error. We find that the validity of the charges against the appellant for aggravated robbery and felonious assault of Larry Henry are collateral to the issue of guilt in the case at bar, and that the trial court did not abuse its discretion in refusing to permit defense counsel to examine Mr. King further on this subject. Cf. *Kent* v. *State* (1884), 42 Ohio St. 426 (paragraph one of syllabus). The appellant does not claim that he was attempting to show that the prosecutor did not have a good faith basis for believing that he had been arrested. See, generally, Annotation, Cross-examination of Character Witness for Accused with Reference to Particular Acts or Crimes, 47 A.L.R. 2d 1258, 1316-1319. It was therefore not error for the court to exclude evidence regarding the merits of the collateral prosecution. Moreover, it is apparent from the proffer of Mr. King's testimony that his answers to defense counsel's questions would have constituted inadmissible hearsay.[5] The second assigned error is overruled.

The appellant's third assignment of error alleges that the trial court erred in excluding the testimony of Dr. Douglas Detterman, an experimental psychologist, on the general unreliability of eyewitness testimony, and on the unreliability of the testimony of the key witness in this case. Detterman was examined out of the presence of the jury, and after hearing his testimony, the court ruled that it was not admissible, apparently on the ground of relevancy.

The general relevancy rule is contained in Evid. R. 401, and it provides:

" 'Relevant evidence' means evidence having any tendency to make the ex-

---

[5] Defense counsel stated that Mr. King would have testified that Larry Henry told him that he was going to drop the charges because they were groundless.

istence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

In the case of expert testimony, an additional requirement of relevancy must be met: to be admissible, the expert's opinion must "assist the trier of fact to understand the evidence or to determine a fact in issue." Evid. R. 702.

Dr. Detterman, in response to a hypothetical question propounded by defense counsel, stated that it would be "very nearly impossible" for Mrs. Anderson to have recognized the man who robbed her, because his face was obscured. He admitted on cross-examination, however, that he had never spoken to Mrs. Anderson or to Detective Burton, that he was unaware that Mrs. Anderson had seen and heard the appellant on sixty to seventy occasions prior to the robbery, and that he was unaware that she had told the police that she knew who her assailant was. Detterman also admitted that individuals differ in their ability to remember and testify about crime. The trial court correctly held that Detterman lacked any basis for his opinion concerning Mrs. Anderson's ability to identify the appellant.

Detterman also testified about experiments which purportedly show the general unreliability of eyewitness testimony. In these experiments a mock crime is staged, and students are asked to choose the perpetrator from a photographic array. Detterman said that the highest level of accuracy achieved by the eyewitnesses in any of these experiments was sixty-five percent. This information, however, is irrelevant to the issue of the guilt of the accused in the case at bar, because there are no statistics on the probability of misidentification by eyewitnesses in cases which are strong enough to be brought to trial. Even if such statistics were available, this court is not persuaded that such information would assist the trier of fact to assess the credibility of the witnesses in the particular case before it.[6]

There are numerous decisions by American courts in which expert testimony regarding the credibility of witnesses has been received. See Annotation, Necessity and Admissibility of Expert Testimony as to Credibility of Witness, 20 A.L.R. 3d 684. All of these cases, however, involved allegations that the witness suffered from an organic illness, a psychiatric disorder, or a mental impairment, which would diminish the witness' ability to accurately perceive, remember, or relate the events testified to. See, e.g., United States v. Hiss (S.D. N.Y. 1950), 88 F. Supp. 559 (psychiatric testimony admitted to show insanity of prosecution witness Whittaker Chambers); State v. Armstrong (1950), 232 N.C. 727, 62 S.E. 2d 50 (medical testimony admitted to show that the eyewitness to the crime had the intelligence of a "low-class moron").

In the few cases on point, the courts have refused to admit expert testimony concerning a witness' lack of credibility, where the alleged impairment of the witness was not due to a physical or mental disease. In Criglow v. State (1931), 183 Ark. 407, 36 S.W. 2d 400, a prosecution for robbery, the court excluded expert testimony on the ability of two of the state's eyewitnesses to observe, recollect, and identify the defendant. In People v. Johnson (1974), 38 Cal. App. 3d 1, 112 Cal. Rptr. 834, a psychologist was not permitted to testify as to the ability of the

---

[6] The statistical likelihood of eyewitnesses to err would seem analogous to the statistical likelihood of a paid informant to lie, or the statistical likelihood that the family of a defendant would consciously or unconsciously fabricate an alibi for the defendant. Such evidence would not assist the trier of fact to determine whether a particular eyewitness, informant, or alibi witness is telling the truth.

witnesses to the crime to accurately perceive, recall, and relate what they saw, where there was no claim that the witnesses suffered from an emotional disturbance or psychological abnormality, but were only frightened. In *Jones* v. *State* (1974), 232 Ga. 762, 208 S.E. 2d 850, the court ruled that psychiatric testimony on the difficulty of a victim of violent crime to accurately identify the assailant should be excluded, because there was no allegation of organic or mental disorder, and because the psychiatrist had not personally examined the witness.

The appellant cites no authority which stands for the proposition that expert testimony is admissible on the issue of the ability of a mentally healthy witness of normal intelligence to accurately observe and recall the details of a crime. We are persuaded that once eyewitness identification testimony from such a witness has been received into evidence, it is the peculiar function of the trier of fact to determine the reliability of such testimony, taking into account all the circumstances surrounding the initial observation and subsequent identification of the accused. It does not appear, from the evidence presented in the trial court, that the field of experimental psychology is able to assist the trier of fact in making a correct determination concerning the accuracy of a particular identification by an eyewitness. The third assigned error is not well taken.

In the fourth assignment of error, it is alleged that the trial court committed prejudicial error when it permitted Detective Burton to testify about the five other photographs shown to Mrs. Anderson along with the photograph of the appellant, in view of the fact that these five photographs were not preserved by the police.[7] Appellant asserts that the state violated Crim. R. 16 in failing to produce the photographs for inspection, and should not have been permitted to refer to the photographs during its case in chief.

Criminal Rule 16(B)(1)(c) provides:

"Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant."

The possible penalties for failure to comply with an order of discovery are contained in Crim. R. 16(E)(3):

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."

There is no indication in the record that the prosecutor ever had "possession, custody or control" of the five photographs in issue, nor is there the slightest evidence that the police intentionally suppressed the photos.[8] Moreover, it does not appear that the appellant complied with the procedural prerequisite of making a written request for discovery in accordance with Crim. R. 16(A) or that the appellant's motion for

---

[7] Detective Burton testified that after the appellant was arrested, he placed all the photographs back in the police files.

[8] The fact that the state's failure to comply

with discovery was unintentional was held to militate against the imposition of sanctions in *State* v. *Mitchell* (1975), 47 Ohio App. 2d 61 [1 O.O.3d 181], and *State* v. *Emmons* (1978), 57 Ohio App. 2d 173 [11 O.O.3d 173].

discovery was timely filed,[9] or that the trial court ever issued an order compelling the state to allow discovery. For these reasons we find that the trial court did not abuse its discretion when it refused to exclude testimony concerning the five photographs. The fourth assigned error is not well taken.

It is the position of the appellant in the fifth assignment of error that the court erred in permitting the prosecutor to refer, during cross-examination of the appellant, to the fact that the appellant did not file a notice of alibi until more than eighteen months after his arrest.[10]

Crim. R. 12.1 states that if the defendant intends to offer evidence tending to establish an alibi, the defendant must, "not less than seven days before trial," file a notice of alibi stating the place he claims to have been at the time of the offense.[11] Since trial did not commence until December 29, 1980, the notice of alibi was timely filed.

Trial was originally scheduled in the case at bar for October 2, 1979. No notice of alibi was filed prior to that date, as required by Crim. R. 12.1. The appellant failed to appear, forfeited bond, and was not recaptured until May 12, 1980. Trial was rescheduled for June 23, 1980, and again, no notice of alibi was filed. The record reflects that the appellant requested and was granted a continuance in order to retain an attorney. After securing an attorney, the appellant filed his notice of alibi on October 23, 1980, ap-

proximately two months before trial. The prosecutor made the appellant's delay in filing a notice of alibi a major subject of his cross-examination of the defendant, and again referred to this point in closing argument.

It is a fundamental principle of American jurisprudence that a criminal defendant may not be compelled to be a witness against himself. Fifth Amendment, United States Constitution. The United States Supreme Court recently held, however, that this principle is not violated when the state seeks to impeach the testimony of a criminal defendant with the fact of his prior silence. *Jenkins* v. *Anderson* (1980), 447 U.S. 231. In *Jenkins*, the court ruled that a criminal defendant waives the protection of the Fifth Amendment when he takes the stand, and the prosecution is not forbidden under the Fifth Amendment from commenting upon the defendant's prior silence. 447 U.S. at 235.

The United States Supreme Court has refused to permit the state to cross-examine a criminal defendant about his prior silence under circumstances where the silence is not probative of guilt, on the ground that such cross-examination is so fundamentally unfair that it constitutes a violation of due process. For example, in *Doyle* v. *Ohio* (1976), 426 U.S. 610, the court reversed a defendant's conviction where, after the appellant testified that he had been "framed," the prosecutor cross-examined him about the fact that he

[9] Crim. R. 16(F) requires criminal defendants to file motions for discovery within twenty-one days after arraignment or seven days before trial. The appellant's motion for discovery was filed July 12, 1979, six weeks after arraignment and several months prior to the original trial date.

[10] See Appendix attached.

[11] A similar requirement under a former statute was upheld as constitutional by the Ohio Supreme Court in *State* v. *Thayer* (1931),

124 Ohio St. 1, wherein the court stated:

"This law [former G.C. 13444-20] pertains to a very important feature of the criminal law. It gives the state some protection against false and fraudulent claims of alibi often presented by the accused so near the close of the trial as to make it quite impossible for the state to ascertain any facts as to the credibility of the witnesses called by the accused, who may reside at some point far distant from the place of trial." 124 Ohio St., at 4. See, also, *Williams* v. *Florida* (1970), 399 U.S. 78.

had not told this story to the police immediately after his arrest. The court noted that at the time of his arrest, the police informed the appellant of his right to remain silent, and that anything he said could be used against him. It was held that in light of this the appellant's silence was "insolubly ambiguous" and that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." 426 U.S. at 617, 618. The Supreme Court expressly reserved judgment on the issue of whether a defendant may be cross-examined about his silence at preliminary hearings or at any other time prior to trial. 426 U.S. at 616, fn. 6.

In contrast, in *Jenkins* v. *Anderson, supra,* the court ruled that it was not fundamentally unfair to permit the prosecution to cross-examine the defendant about his pre-arrest silence. The defendant in that case had surrendered to the police two weeks after stabbing a person to death. At trial the defendant testified that he acted in self-defense. The prosecutor cross-examined the defendant closely about the fact that he waited two weeks before turning himself in. In ruling that such cross-examination is permissible under the Constitution, the court distinguished *Doyle* on the ground that "no governmental action [the giving of a *Miranda* warning] induced petitioner to remain silent before arrest." 447 U.S. at 240. The court in *Jenkins* relied primarily upon the decision of *Raffel* v. *United States* (1926), 271 U.S. 494, which held that where a defendant testifies at a retrial of his case, the prosecutor is permitted to cross-examine the defendant about the fact that he did not take the stand at his previous trial.

We are persuaded that, under the particular circumstances of this case, it was not fundamentally unfair for the prosecutor to bring to the attention of the jury the appellant's failure to file his notice of alibi at an earlier date, although this court does not view it as a desirable practice. The appellant apparently had no intention of claiming alibi at his previously scheduled trials, for no notices of alibi were filed on those occasions. A logical, almost compelling, inference is that the appellant concocted his alibi defense after his last previously scheduled trial date. The previous silence of the appellant is highly probative of guilt. Therefore it was not "fundamentally unfair" for the prosecution to comment upon the appellant's failure to file a notice of alibi prior to October 23, 1980.[12]

We hold that the cross-examination conducted by the prosecutor violated neither the appellant's right to remain silent nor the appellant's right to due process of law. The fifth assigned error is not well taken.

In his sixth assigned error, the appellant contends that it was prejudicial error for the trial court to refuse him permission to recall Eva Warren to the stand, so that she could "clarify an error in her testimony" regarding the time she left Mrs. Jones' house on the evening of the robbery. Defense counsel stated that if Mrs. Warren had been recalled to the stand, she would have given the following testimony:

"* * * Mrs. Warren would have testified that her testimony yesterday afternoon to the effect that she left Mrs. Jones' house at 7:10 P.M. was wrong, and upon further reflection and conversation with her sister, realized that she made a mistake in the time, and instead of leaving there at 7:10 as she testified, she actually left there at 6:10 P.M., and had she

---

[12] We express no opinion upon the issue of whether a prosecutor may cross-examine a defendant about the defendant's failure to interpose an alibi defense at an early date, in the absence of the special circumstances present in the case at bar, *i.e.,* the fact that the appellant did not file a notice of alibi prior to his two previously scheduled trial dates.

testified, she further would have said that at the time she left the house, Ricardo Sims, the defendant in this case, was still present at the house."

The prosecutor, in opposing defense counsel's request to let Mrs. Warren resume the stand, gave a different version of how Mrs. Warren discovered that her testimony regarding the time she left Mrs. Jones' house was false:

"Yesterday, prior to the testimony of Eva Warren, Mr. Gross indicated to me that he had records from Mount Sinai Hospital to corroborate and substantiate the testimony of Eva Warren.

"Eva Warren took the stand and gave her testimony as to her remembrance of the times involved in this case which, of course, because of the nature of the defense, — alibi — in this case, those times are critical.

"After her testimony, Mr. Gross had an opportunity to talk with the medical records librarian from Mount Sinai Hospital. It was at that time he found those times were different, were completely different, and false and wrong and a contradistinction from the testimony of Eva Warren.

"After having obtained that information, Mr. Gross dismissed this witness and told her her services would no longer be needed and allowed her to leave the court with those documents.

"Your Honor, at this time this morning, after having contacted Mount Sinai Hospital, the medical records librarian came down again. She indicated to me that Mr. Gross again talked to her this morning and looked through her records. It is our contention that the sole purpose for defense counsel's effort to recall his witness to the stand is to somehow explain away the lies which she thrusted [sic] upon the Court yesterday."

The medical records librarian, called as a rebuttal witness by the state, authenticated the medical records showing that Mrs. Warren arrived at the hospital at 6:37 p.m., and testified that defense counsel had examined the medical records the previous day outside the courtroom, and had told her that he didn't need the records and that she could leave. She also confirmed that the prosecutor contacted her later that day and asked her to return to court the next day with the medical records.

It is apparent that the defense attempted to recall Mrs. Warren to "clarify" her testimony only after it learned that the prosecution intended to introduce the medical records showing that her previous testimony was incorrect. It seems implausible that Mrs. Warren learned of the "error" in her testimony by talking to her sister, since Mrs. Jones also testified that Mrs. Warren left her home "a little bit after seven." One could infer from the record that defense counsel attempted to suppress evidence showing that his witness Mrs. Warren had testified falsely, and that only when this attempt failed did he move to recall Mrs. Warren to the stand.

Evid. R. 611 empowers trial courts to exercise "reasonable control over the mode and order of interrogating witnesses* * *." Whether to permit a witness to be recalled to the stand to give additional testimony is a matter committed to the sound discretion of the trial court. *C.M.V. Ry. Co.* v. *Thompson* (1900), 21 C.C. 778. In the case at bar, the decision of the court to forbid Mrs. Warren from taking the stand again was reasonable and was not an abuse of discretion. The sixth assigned error is not well taken.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

CELEBREZZE and MARKUS, JJ., concur.

Appendix

The prosecution conducted the following cross-examination on this subject:

"Sir, isn't it a fact that after your arrest, in March of 1979, you had an occasion to come to Court for various pretrials during the course of the proceedings in this case; isn't that a fact?

"A. Pretrials? Could you —

"Q. Did you ever come to — did you ever come to Court here, prior to the trial?

"A. Yes. I showed up.

"Q. After your arrest?

"A. Yes.

"Q. And you in fact came here several times, right?

"A. That's right.

"Q. Sir, isn't it a fact that you only filed your Notice of Alibi in October —

"MR. GROSS: Objection.

"MR. REITH: Objection.

"Q. — 1980?

"A. That's false.

"Q. You filed it before that time?

"A. Yes.

"Q. When did you file it, sir?

"A. With my previous —

"MR. GROSS: Your Honor, may we approach the bench?

"A. — previous counsel.

With previous counsel —

"Q. When did you file that, sir?

"A. Pardon me?

"Q. When did you file that?

"A. When did I file it?'

"Q. Right.

"MR. GROSS: Your Honor, I'm going to object.

"May I approach the bench?

"A. File it?

"Q. Filed it.

"THE COURT: Overruled.

"Q. Sir, when did you give your notice that you were going to plea — to plead alibi in this case?

"A. Last year.

"Q. When?

"A. When I came to Court.

"Q. You are saying that from the first time that you were arrested, right from the start, you filed your Notice of Alibi?

"A. My lawyer didn't. The previous lawyer that I had, no, he didn't, but I had to suggest it to him, yes.

"Q. Sir, when was the first time you filed a Notice of Alibi in this case?

"A. Sir, is you talking about my previous lawyer or my lawyer that I have now?

"Q. Sir, I'm talking about this case now.

"MR. GROSS: Objection.

"THE COURT: Overruled.

"Q. I don't care what lawyer you are talking about.

"In this case when was the first time you filed your Notice of Alibi in this case?

"A. As far as this case with my lawyer —

"Q. This case.

"A. — that I have obtained now?

"Q. That's right.

"A. It would be when he was first assigned to the case.

"Q. So you first filed your notice of alibi in this case in October of 1980?

"A. Yes. That's when he was assigned to the case, yes.

"Q. So as a result, you waited for more than a year and a half to say that you had an alibi in this case?

"A. No, that's not true.

"Q. Isn't it a fact this whole alibi is nothing but a try concocted by your friends to help you out?

"A. False." (Tr. 240-243.)

The prosecutor also commented on the timing of the filing of the notice of alibi in closing argument:

"Now, ladies and gentlemen, I ask you this question: If you have been charged with a crime, and you were asked to come into Court and you went to a pretrial hearing and at that hearing the victim of the case positively identified you based upon all the circumstances involved and based upon her ability to recognize you, ladies and gentlemen, what would you do?

"You have got to come up with something and that's what the defendant

did in this case. Sure, it is an alibi. That's what he did here. Just like in the other case.

"Ladies and gentlemen, the defendant has used the defense of alibi to cover the fact of his complete involvement in this case." (Tr. 333.)