OPINION
Sharon Thomas, in her capacity as guardian of Clarence Thomas, and Lee Thomas, the son of Clarence Thomas, appeal from a judgment of the Montgomery County Court of Common Pleas which overruled their motion for a judgment notwithstanding a jury verdict in favor of Miami Valley Hospital ("Miami Valley") and for a new trial.
On September 1, 1995, the Thomases were involved in a car accident on Interstate 70 outside of Dayton while en route to Cleveland from their home in Missouri. Clarence Thomas was seriously injured in the accident and was airlifted to Miami Valley. Thomas had suffered numerous broken bones and serious damage to his right lung as a result of the accident, but he had not suffered any brain damage. From September 3 through September 26, Thomas was kept in a "doctor-induced sleep" due to the severity of his injuries and in order to prevent him from fighting the respirator that helped him to breathe. On September 26, 1995, while in the doctor-induced sleep, Thomas suffered a cardiac arrest. Although medical personnel eventually restored Thomas's heartbeat, he suffered severe and permanent brain damage as a result of the cardiac arrest.
On August 29, 1997, the Thomases filed a complaint against Miami Valley alleging that hospital personnel had acted negligently in responding to Thomas's cardiac arrest. The Thomases relied upon the heart monitor's record that Thomas's cardiac arrest had lasted for eleven minutes and charting indicating that hospital personnel had worked for five minutes to resuscitate Thomas. From these records, the Thomases inferred that approximately six minutes had passed before hospital personnel had responded to the cardiac arrest.
Before trial, the Thomases filed numerous motions in limine, including one which sought to bar expert testimony challenging the accuracy of the times charted in the medical records. The trial court ruled that no defense expert would be permitted to offer an opinion that the specific times charted on the medical records by Miami Valley personnel were inaccurate. The trial court placed no restrictions, however, on non-expert testimony challenging the charted times or on general expert testimony about factors affecting the reliability of charting during critical care situations.
In their case in chief, the Thomases sought to establish the accuracy of some of the charted times through the testimony of the hospital personnel involved with Thomas's cardiac arrest, and their experts relied on the accuracy of the times in concluding that hospital personnel had acted negligently in the treatment of Thomas. The trial court subsequently ruled that the Thomases had opened the door to expert testimony concerning the accuracy of the charted times. Accordingly, in its case in chief, Miami Valley presented testimony from experts in "code" (i.e., critical care) situations about the need during a code to focus on the patient rather than on charting and the questionable reliability of retrospective charting. Miami Valley also presented testimony from the hospital personnel involved with Thomas's cardiac arrest, including Dr. Ranjan Sudan, who was instrumental in resuscitating Thomas. The personnel stated that they had completed the charting after the code and that the precise times were not necessarily reliable. At the close of Miami Valley's case, the Thomases sought to recall one of their experts in rebuttal, but the trial court would not permit them to do so.
The jury returned a verdict in favor of Miami Valley and its employees, finding that they had not "negligently departed from the accepted standard of care" in their treatment of Clarence Thomas. The Thomases filed motions for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court overruled the motions.
The Thomases raise two assignments of error on appeal, which we will address together.
 THE TRIAL COURT ERRED IN DENYING PLAINTIFFS-APPELLANTS' REQUEST TO CALL DR. FINTEL IN REBUTTAL.
 II. THE TRIAL COURT ERRED IN PERMITTING DEFENDANT TO INTRODUCE EXPERT TESTIMONY ATTACKING THE CREDIBILITY OF EYEWITNESSES BY ATTACKING THE ACCURACY OF THE MEDICAL RECORDS, THEREBY VIOLATING THE RULE IN BUELL AND SIMS.
The Thomases claim that they should have been allowed to call their expert in rebuttal because they had withheld certain evidence in their case in chief in reliance on the trial court's liminal ruling that expert testimony regarding the accuracy of the charted times would not be allowed. Thus, they claim that, without presenting rebuttal evidence, they were prejudiced by the court's reversal of its liminal decision. The Thomases also maintain that the testimony of the defense experts regarding the accuracy of the charted times was an impermissible attack on the credibility of the eyewitnesses in the case because it challenged their ability to perceive and recall with precision their actions during Thomas's cardiac arrest. The Thomases' case against Miami Valley relied heavily upon the accuracy of the charted times. The Thomases' theory of the case was that Thomas's brain damage had been caused by the failure of Miami Valley personnel to promptly respond to Thomas's cardiac arrest. The Thomases relied upon the discrepancy between the cardiac monitoring strip, which showed the length of the cardiac arrest to be eleven minutes, and charting and testimony from hospital personnel, which indicated that they had worked for approximately five minutes to resuscitate Thomas. Based on this evidence, the Thomases' experts, including Dr. Daniel Fintel, opined that Miami Valley personnel had negligently deprived Thomas of life-saving treatment. In formulating his opinion that Miami Valley personnel had acted negligently, Dr. Fintel had admittedly relied on the accuracy of the charts and had selectively credited and discredited the deposition testimony of those who had been involved with Mr. Thomas's care. For example, Dr. Fintel based his opinion on Dr. Sudan's notes in the chart that he had worked to resuscitate Thomas for five minutes, but did not account for Dr. Sudan's deposition testimony that he had no idea how long the code had lasted and that he had probably asked someone else about the length of the code in creating the record.
Miami Valley was entitled in its defense to present evidence that the charted times upon which the Thomases' experts had relied were not necessarily accurate, that the focus in these circumstances is on patient care and not on accurate charting, and that charting is often done several hours after the critical event. It did so through the testimony of those who actually charted the times as well as expert testimony about the retrospective manner in which code situations are often charted. The trial court correctly refused to characterize this defense as an attack on the credibility of the witnesses.
During Dr. Fintel's testimony in the Thomases' case in chief and again at the close of their case, the trial court ruled that they had "clearly asserted that the various times were accurately charted" and had thereby opened the door to testimony about the reliability of the charting. After Miami Valley had called six witnesses in its case in chief, including four experts, the Thomases filed a motion to call Dr. Fintel in rebuttal so that he could testify about, and they could introduce, certain exhibits that they had withheld in their case in chief, allegedly in reliance on the court's liminal ruling. The exhibits addressed the amount of time between key events in Thomas's cardiac arrest as evidence of negligence apart from the actual times at which the events occurred. The Thomases' attorney asserted that he had planned all along (and still planned) to use the graphics in his closing argument, but that he also would have used them during his case in chief but for the court's initial ruling on his motion inlimine. After reviewing Dr. Fintel's testimony in the Thomases' case in chief, the trial court refused to allow the Thomases to call Dr. Fintel in rebuttal. The trial court permitted the Thomases to use the exhibits while cross-examining Miami Valley's witnesses and during their closing argument.
As the Thomases have pointed out, a party has an unconditional right to present rebuttal testimony on matters which are first addressed in an opponent's case-in-chief. Phung v. WasteMgt., Inc. (1994), 71 Ohio St.3d 408, 410. In all other situations, however, decisions on the admissibility of rebuttal testimony are within the sound discretion of the trial court.State v. McNeill (1998), 83 Ohio St.3d 438, 446; Sowers v.Middletown Hosp. (1993), 89 Ohio App.3d 572, 5592, citing Berry v.Motorists Mut. Ins. Co. (1983), 13 Ohio App.3d 228. An abuse of discretion means more than an error of law or judgment; it implies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an "abuse" in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but of passion or bias.
Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 87. Thus, an abuse of discretion will not be found simply because the reviewing court could reach a different conclusion if it were deciding the issue de novo. AAAA Enterprises, Inc. v. River PlaceComm. Urban Redev. Corp. (1990), 50 Ohio St.3d 157, 161.
The trial court properly rejected the Thomases' claim that rebuttal evidence was required because the accuracy of the charted times had been raised for the first time in Miami Valley's case in chief. The Thomases had presented evidence regarding the accuracy of the charted times in its case in chief. Thus, this case was unlike Phung, 71 Ohio St.3d at 410, in which the defense offered a theory of the case that had not been touched upon in the plaintiff's case in chief. Moreover, the trial court had informed the Thomases during their case in chief-while Dr. Fintel was still on the stand-that they had opened the door to testimony challenging the accuracy of the charted times.
In overruling the Thomases' motion, the court concluded, after reviewing Dr. Fintel's testimony from the Thomases' case in chief, that the substance of the testimony that the Thomases wanted to elicit from Dr. Fintel on rebuttal had already been covered in their case in chief, albeit in a slightly different form. Specifically, the court ruled that the Thomases had already attempted to correlate the testimonies of the hospital personnel to the effect that they had tried to resuscitate Thomas for five minutes notwithstanding differences in charted times. The trial court further ruled that it would have been "improper and unfair" to Miami Valley to permit the rebuttal testimony because the motion was made well into Miami Valley's case in chief and after it had called several experts. The court may also have been concerned by the amount of time involved in bringing Dr. Fintel back to Dayton to testify and the possibility that Miami Valley would then want to recall some of its experts to respond to Dr. Fintel's opinions. Moreover, the trial court could have reasonably considered the fact that the Thomases had been told during their case in chief that they had opened the door to expert testimony about the accuracy of the times.
In our view, the trial court made a reasonable choice among competing considerations in excluding Dr. Fintel's rebuttal testimony. Although we might have been inclined to allow the rebuttal testimony if deciding the issue in the first instance, we cannot conclude that the trial court's decision was arbitrary, unreasonable, or "grossly violative of fact and logic" so as to have required a new trial. See Huffman, 19 Ohio St.3d at 87.
The holdings in State v. Buell (1986), 22 Ohio St.3d 124, andState v. Sims (1981), 3 Ohio App.3d 321, do not compel a different conclusion, as the Thomases have repeatedly suggested. These cases held that an expert may testify about "factors or variables involved in assessing the reliability of eyewitness testimonygenerally, * * * [but may not] testify as to how these factors affected the mental processes of specific witnesses." (Emphasissic.) Buell, 22 Ohio St.3d at 132. The trial court's rulings were consistent with the holdings in Buell and Sims. Throughout the proceedings, the trial court prohibited expert testimony that any particular charted time or the recollection of any of particular eyewitness was inaccurate, and it allowed testimony only on the general variables affecting charting in code situations. The first and second assignments of error are overruled.
The judgment of the trial court will be affirmed.
FAIN, J., concurs.