THE STATE OF OHIO, APPELLEE, *v.* BUELL, APPELLANT.

[Cite as State *v.* Buell (1986), 22 Ohio St. 3d 124.]

(No. 85-712—Decided February 19, 1986.)

*Keith A. Shearer,* prosecuting attorney, and *Martin Frantz,* for appellee.

*Burdon & Merlitti, James L. Burdon* and *Lawrence J. Whitney,* for appellant.

DOUGLAS, J.

I

During the trial the prosecution introduced the testimony of three witnesses who claimed to have seen the appellant in the ballpark one week before the abduction, two witnesses who claimed to have seen the appellant in the park on the day Krista was kidnapped, and one who claimed to have seen the appellant leaving the site where the body was found.

The testimony of the ballpark witnesses was inconsistent and contradictory. The ballpark witnesses did not agree about whether one of them argued or merely conversed with a spectator, whether the spectator stood, sat or squatted, or whether one of the three of them had actually observed the spectator at all. Two of the three witnesses identified the ap-

pellant as the spectator only after seeing him on television and in the newspapers and only after discussing between themselves whether the appellant, as viewed on television, was the spectator they saw in the park some sixteen months earlier. Each of these witnesses testified that at most they observed the appellant for less than one minute.

Stephanie Baker, who also saw the abductor in the park, and Roy Wilson gave similar descriptions of Krista's kidnapper, but each selected the same incorrect picture from photo arrays which included the photo of appellant. Neither could identify the appellant in court.

The final identification witness, Donald J. Middleton, claimed to have seen a man driving a raspberry-colored car away from the shed where Krista's body was found. Middleton stated that he observed the man from his pick-up truck as they passed on opposite sides of the road. This observation lasted less than five seconds. The description Middleton gave to police included physical details significantly different from those of the appellant. When shown a photo array a few days after Krista's death, Middleton was not able to select anyone. Sixteen months later, Middleton identified the appellant when shown a picture of a van, the appellant and a car, and after seeing the appellant on television.

Appellant sought to introduce the testimony of an experimental psychologist, Steven Penrod, (1) with regard to factors involved in the mental processes of identifications generally, and (2) to render his opinion about the accuracy and credibility of the specific identification testimony of four of the witnesses. Upon the trial court's ruling that Penrod's testimony was inadmissible, it was proffered by the appellant for review on appeal.

The prosecutor successfully argued against the admission of Penrod's testimony, citing the holding in State v. Sims (1981), 3 Ohio App. 3d 321. Specifically, that court held as reflected in paragraph two of the syllabus:

"The expert testimony of an experimental psychologist concerning the statistical likelihood of eyewitnesses to observe and recall accurately the details of a crime is not admissible, on the ground that such testimony does not assist the trier of fact to determine the facts in the case before it. * * *"

Appellant contends that the holding in Sims should be limited to the particular facts of that case and urges this court to find: (1) that expert psychological testimony regarding factors which may impair the accuracy of typical eyewitness identifications are admissible under Evid. R. 702; (2) that expert psychological testimony regarding the credibility of the identification testimony of a particular witness is admissible under Evid. R. 702; and (3) that the failure of the trial court to allow the proffered testimony in this case was an abuse of discretion.

Evid. R. 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The Staff Note to this rule characterizes it as an embodiment of the general rule regarding admissibility of testimony from expert witnesses generally, and recites the principle underlying the rule as articulated in *Hartford Protection Ins. Co.* v. *Harmer* (1853), 2 Ohio St. 452, 456-457:

"* * * In everything pertaining to the ordinary and common knowledge of mankind, jurors are supposed to be competent, and, indeed, peculiarly qualified to determine the experienced connection between cause and effect, and to draw the proper conclusion from the facts before them. But they are selected with no view to their knowledge of particular services, trades, and professions, requiring a course of previous study and preparation. As questions connected with these will very often arise, and as the law deprives the jury of no reliable means for ascertaining the truth, *it allows them to be aided,* in making the proper application, by the opinions of witnesses possessing peculiar skill in those particular departments. * * *" (Emphasis added.)

The appellant contends, and we agree, that the standard for determining whether expert testimony is admissible is whether it will assist the trier of fact in assessing the weight to be given a particular witness. However, in agreeing with appellant, we do not disagree with the *Sims* court's decision as cited above, but rather we find that ruling misapplied here.

In *Sims,* the psychologist presented the results of an experiment involving student identifications of the perpetrator of a mock crime. The highest accuracy level achieved by these eyewitnesses was sixty-five percent. The *Sims* court at 325 ruled that:

"* * * This information, however, is *irrelevant* to the issue of the guilt of the accused in the case at bar, because there are no statistics on the probability of misidentification by eyewitnesses in cases which are strong enough to be brought to trial. Even if such statistics were available, *this court is not persuaded that such information would assist the trier of fact* to assess the credibility of the witnesses in the particular case before it." (Emphasis added.)

In footnote 6 at 325 the court added:

"The statistical likelihood of eyewitnesses to err would seem analogous to the statistical likelihood of a paid informant to lie, or the statistical likelihood that the family of a defendant would consciously or unconsciously fabricate an alibi for the defendant. Such evidence would not assist the trier of fact to determine whether a *particular* eyewitness, informant, or alibi witness is telling the truth." (Emphasis added.)

We agree with the court's analysis in *Sims.* Further, it appears to this court that this kind of testimony is rarely likely to pass the test of relevancy under Evid. R. 401 and the exclusory provisions of Evid. R. 403(A). On the other hand, the proffered testimony in this case proposed, in part,

to apprise the jury of the factors which are likely to affect the processes involved in memory. The admissibility of this kind of testimony rests, at least in part, upon whether such information is within the general knowledge of the jury. Appellant cites several cases which persuade us that such generalized testimony could be helpful to a jury and should not be held as inadmissible in every instance.

In *United States* v. *Smith* (C.A. 6, 1984), 736 F. 2d 1103, certiorari denied (1984), ____ U.S. ____, 83 L. Ed. 2d 143, an Ohio case, the defendant attempted unsuccessfully to introduce the testimony of an experimental psychologist whose testimony would have provided the jury with insight into an eyewitness' general inability to perceive and remember what is seen under a stressful situation. The Sixth Circuit Court of Appeals rejected the district court's conclusion that the " 'jury is fully capable of assessing the eyewitnesses' ability to perceive and remember,' " (*id.* at 1105) and stated:

"Such testimony might have been relevant * * * and not only might have *assisted* the jury, but might have refuted their otherwise common assumptions about the reliability of eyewitness identification." (Emphasis sic.) *Id.* at 1106.

Similarly, in *United States* v. *Downing* (C.A. 3, 1985), 753 F. 2d 1224, the Third Circuit Court of Appeals rejected the district court's conclusion that the testimony of an expert in the field of human perception and memory was inadmissible, because such testimony could never meet the "helpfulness" requirement of Fed. R. Evid. 702.[5] The appellate court held that expert testimony, which informed the jury about such variables as "(1) the 'forgetting curve,' i.e., the fact that memory does not diminish at a uniform rate; (2) the fact that, contrary to common understanding, stress causes inaccuracy of perception and distorts one's subsequent recall; (3) the 'assimilation factor,' which indicates that witnesses frequently incorporate into their identifications inaccurate information gathered after the event and confused with the event; (4) the 'feedback factor,' which indicates that where identification witnesses discuss the case with each other they can unconsciously reinforce their individual identifications; and (5) the fact that studies demonstrate the absence of a rela-

---

[5] Ohio's Evid. R. 702 is an exact transcription of the federal rule of the same number. In *Downing, supra,* at 1229, the court stated:

"Under [federal] Rule 702, 'an expert can be employed if his testimony will be helpful to the trier of fact in understanding evidence that is simply difficult, [though] not beyond ordinary understanding.' S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 451 (3d ed. 1982)."

The Advisory Committee Notes to this rule state in part:

"Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of *assisting* the trier." (Emphasis added.)

As noted, the Ohio rule contemplates the same "helpfulness" criterion regarding the admissibility of expert testimony and, in addition, views admissibility favorably when such is relevant. See *State* v. *Williams* (1983), 4 Ohio St. 3d 53.

tionship between the confidence a witness has in his or her identification and the actual accuracy of that identification" (*id.* at 1230) could be helpful. The court stated that "[e]ach of these 'variables' goes beyond what an average juror might know as a matter of common knowledge, and indeed some of them directly contradict 'common sense.'" *Id.* at 1230-1231.

The *Downing* court was persuaded by the decision announced in *State v. Chapple* (1983), 135 Ariz. 281, 660 P. 2d 1208. In the *Chapple* case, the Arizona Supreme Court, in overruling the lower court's exclusion of similar expert testimony, concluded at 293, 660 P. 2d at 1220:

"Even assuming that jurors of ordinary education need no expert testimony to enlighten them to the danger of eyewitness identification, the offer of proof indicated that Dr. Loftus' testimony would have informed the jury that there are many specific variables which affect the accuracy of identification and which apply to the facts of this case."

In *People v. McDonald* (1984), 37 Cal. 3d 351, 208 Cal. Rptr. 236, 690 P. 2d 709, the court commented on the knowledge of the jury regarding eyewitness identifications:

"* * * It is doubtless true that from personal experience and intuition all jurors know that an eyewitness identification can be mistaken, and also know the more obvious factors that can affect its accuracy, such as lighting, distance, and duration. * * *" *Id.* at 247, 690 P. 2d at 720.

The court concluded, however, that the variables or factors about which psychologists could testify are "'sufficiently beyond common experience' that in appropriate cases expert opinion thereon could at least 'assist the trier of fact * * *.'" *Id.* at 248, 690 P. 2d at 721.

In the case before us, the expert's testimony could have provided similar information to the jury. Thus, we hold that based upon our analysis of these cases and Evid. R. 702, the expert testimony of an experimental psychologist concerning the variables or factors that may impair the accuracy of a *typical* eyewitness identification is admissible under Evid. R. 702.

Appellant also contends that the opinion testimony of the expert regarding the accuracy of the *specific* identification testimony of witnesses in this case is admissible under Evid. R. 702. We disagree. While we find the appellant's first argument persuasive, we are not convinced that the expert opinion of an experimental psychologist should be admissible regarding the credibility of a *particular* witness' identification testimony, absent some special identifiable need for the testimony.[6]

---

[6] The *Sims* court also held as reflected in paragraph two of the syllabus:

"* * * The expert testimony of an experimental psychologist, on the issue of whether a *particular* eyewitness was testifying accurately is likewise inadmissible in the absence of any evidence that the witness suffers from a mental or physical impairment which would affect the witness' ability to observe or recall events." (Emphasis added.)

It was the *Sims* court's conclusion at 325 that:

The expert testimony offered in *Smith, Downing, Chapple* and *McDonald* regarded factors or variables involved in assessing the reliability of eyewitness testimony *generally*. The expert was not allowed to testify as to how these factors affected the mental processes of *specific* witnesses.

These results and the result reached in *Sims* regarding such testimony are supported by the Advisory Committee Notes to Fed. R. Evid. 702 and the Staff Note to Ohio's Evid. R. 702 which state, respectively:

"* * * The rule * * * recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, *leaving the trier of fact to apply them to the facts.*" (Emphasis added.)

"* * * The purpose of a jury is to determine the correctness of the * * * [expert's] opinions. * * * The jury makes that determination by weighing the testimony, applying the usual test of credibility, *finding the presence or absence of facts constituting the hypothesis, and by drawing its own inferences and conclusions from the principles explained.*" (Emphasis added.)

The appellant argues that both the situations accompanying the initial observations and the unusual circumstances surrounding the identification procedures in this case created an atmosphere of suggestibility which might not have been obvious to the jury. Appellant maintains that fairness required the admission of the opinion testimony to balance what might have appeared to the jury as substantial corroborated affirmative identifications. Again, we reject the appellant's thesis.

The witnesses in this case, as all others, are subject to cross-examination pursuant to Evid. R. 611(B), during which time the defense has the opportunity to point out to the jury any discrepancies and inconsistencies in their testimony. Such cross-examination was ably conducted in this case. In addition, closing argument provides the defense with another opportunity to alert the jury to factors which affect the reliability of the identifications offered at the trial. During closing argument in this case the defense raised the issues of the passage of time, short observations and the inconsistent identifications in evidence, as well as other factors. The jury was capable of assessing these factors. When the trial ended, the jury was properly instructed regarding witness credibility and

---

"There are numerous decisions by American courts in which expert testimony regarding the credibility of witnesses has been received. * * * All of these cases, however, involved allegations that the witness suffered from an organic illness, a psychiatric disorder, or a mental impairment, which would diminish the witness' ability to accurately perceive, remember, or relate the events testified to. * * *"

The court further concluded at 326:

"The appellant cites no authority which stands for the proposition that expert testimony is admissible on the issue of the ability of a mentally healthy witness of normal intelligence to accurately observe and recall the details of a crime."

We arrive at the same conclusion. See, also, Annotation (1968), 20 A.L.R. 3d 684, Section 2(a), and Supp. (1985).

the weighing of eyewitness testimony. This court is convinced that, taken as a whole, these rebuttal opportunities provided the jury with a balanced and fair presentation of the facts surrounding the identification testimony offered.[7]

In conclusion, we hold that the expert testimony of an experimental psychologist regarding the credibility of the identification testimony of a *particular* witness is inadmissible under Evid. R. 702, absent a showing that the witness suffers from a mental or physical impairment which would affect the witness' ability to observe or recall events.

Was the exclusion of the expert's testimony an abuse of the trial court's discretion? We answer in the negative. This court held in *State* v. *Williams* (1983), 4 Ohio St. 3d 53, syllabus, that the decision whether testimony is relevant and will assist the trier is within the discretion of the trial court. Additionally, under Evid. R. 403(B), the trial court retains discretionary authority to exclude even relevant evidence if that evidence would unduly waste time or confuse the issues at trial.

The trial court rejected the expert's testimony apparently finding that it would not be an aid to the jury. The trial court stated: "* * * So it's the Court's opinion that the jury can make the determination on who to believe and who not to believe, using the tests that I will describe to them, using their common sense, and they do not need an expert to help them do that."

Those cases which have found exclusion of such testimony to constitute an abuse of discretion differ from the one at bar in that in those cases the only evidence connecting the defendant to the crime was the identification testimony. See *Chapple* and *Downing, supra.* Conversely, in *Smith, supra,* the court held that even where it was error to exclude such expert testimony the error was "harmless" where other uncontroverted or substantial evidence links the defendant to the crime.

We find that the evidence of the defendant's guilt was based primarily on physical evidence rather than identification testimony. In light of the substantial physical evidence, it cannot be said that "* * * 'it is more probable than not the [exclusion] affected the verdict.' " *Smith, supra,* at 1107, citing *United States* v. *Rasheed* (C.A. 9, 1981), 663 F. 2d 843.

For these reasons, we hold that the trial court's decision not to allow the expert to testify as to the variables which affect typical eyewitness identification did not constitute an abuse of discretion.

## II

During the prosecution's direct examination of FBI agent Alan T.

---

[7] As aptly noted by the appellate court, such expert testimony regarding a particular witness' identification testimony constitutes an attack on the general credibility of the witness by extrinsic evidence of a collateral matter. The introduction of extrinsic evidence to impeach credibility is limited by Evid. R. 608(A) to evidence of one's character for truthfulness or untruthfulness.

Robillard, regarding his comparative analysis of carpet fibers, the following hypothetical question was posed:

"* * * [N]ow assuming the following facts in addition to all of the observations that you have made to the jury, first of all assume that the carpeting from the defendant's house and the van were manufactured by J.P. Stevens Company; secondly assume further that only twelve thousand, fifteen yards . . . twelve thousand, fifteen square yards of that particular carpeting was [*sic*] ever manufactured. I'm referring now to the carpeting that you have just described having come from the van and the roll of carpeting. Assume further that this twelve thousand fifteen square yards of carpeting was [*sic*] manufactured between May of 1979 and July of 1981. Based upon those facts and those assumptions, what is your opinion based upon a reasonable scientific certainty as to the origin of the fibers found on the bedspread * * *."

Appellant contends that the trial court erred in permitting the agent's response as follows:

"My opinion is, it's extremely likely based on these assumptions that the fibers from the bedspread [blanket] came from Mr. Buell's carpeting."

Appellant relies upon this court's holding in *State* v. *Holt* (1969), 17 Ohio St. 2d 81 [46 O.O.2d 408], and asserts that the expert's opinion regarding the similarity or dissimilarity of these fibers must be based on "reasonable scientific certainty" or "probability" not in terms of only a "likelihood." This court ruled in *Holt, supra,* that it was reversible error for an expert to testify that hair samples were "likely" to be from the same source. Even considering *Holt,* however, we do not agree with appellant's contention. In the case before us, the expert testified as to an *extreme* likelihood of similarity. The modification of the word "likely" by the adverb "extremely" makes the phrase "extremely likely" equivalent to the word "probable." Cf. *Boze* v. *Indus. Comm.* (App. 1940), 32 Ohio Law Abs. 238, at 242, where the court ruled that the term " 'quite possible' " as employed by an expert witness was equivalent to " 'probable.' " Thus we find this claim of error to be without merit.

## III

Appellant also seeks reversal of his conviction based on the trial court's alleged prejudicial error in admitting hearsay testimony regarding a shirt found at the scene where the victim's body was discovered. Over objection of appellant, Officer Roger Pennell was allowed to testify as follows, regarding a shirt given to him by George Dawson on July 24, 1982:

"[Pennell:] A. He indicated that he understood that we had found some garments alongside of the roadway. I told him that I did. Or that we did . . . our department did . . . and he said, that well, he had found this shirt and . . . along the roadway on the 23rd, the day previous, prior to this; and as a result of that he had taken it home and layed [*sic*] in one of his wash baskets in the laundryroom.

"[Prosecution:] Q. Now did you subsequently obtain State's Exhibit R from Mr. Dawson?

"[Pennell:] A. Mr. Dawson said that he would proceed to his residence and bring that shirt back and give it to me and within a few minutes he proceeded and went to his residence and came back and had the shirt in hand and I left [*sic*] him drop it right in a plastic bag and I sealed it and gave him a receipt for it."

"Hearsay" is defined in Evid. R. 801(C) as:

"* * * [A] statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Unless the hearsay testimony falls within one of the exceptions under Evid. R. 802 or 803, it is inadmissible.

Appellant is correct in his assertion that the foregoing testimony is hearsay and, as such, should not have been allowed at trial. However, we do not agree with appellant that this admission constitutes reversible error, but rather we find this error was harmless.

Crim. R. 52(A) defines harmless error as: "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." This court, in *State* v. *Ferguson* (1983), 5 Ohio St. 3d 160, 166, at fn. 5, commented regarding the appropriateness of finding harmless error:

"* * * [T]he cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction. * * *"

As noted above, the defendant was convicted in light of the presentation of substantial physical evidence. We are convinced that even if the hearsay testimony were to be eliminated from consideration, sufficient evidence would remain to constitute overwhelming proof of the defendant's guilt.[8] See, also, *State* v. *Williams* (1983), 6 Ohio St. 3d 281, paragraph six of the syllabus.

Finding no basis for reversing the trial court's ruling, we uphold the appellant's convictions.

## IV

Turning next to the sentencing phase of the trial, appellant claims that Ohio's death penalty statutes are unconstitutional *per se* and are violative of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of

---

[8] The appellant argues that the shirt, as well as the testimony, should not have been introduced and refers this court to his objection on the grounds of improper foundation. The court properly overruled this objection although we do note that in light of the expert's testimony that " 'no conclusive association could be established between * * * [the defendant's shirt and the one offered as exhibit R]' " there may have been a basis for excluding the shirt on grounds of relevancy. We need not rule on this matter since no such objection was made.

the Ohio Constitution. Appellant's constitutional claims have been subdivided into sixteen issues, and are in part as follows:

(1) The death penalty violates due process because it is not a deterrent and, therefore, does not serve a compelling state interest;

(2) The death penalty constitutes cruel and unusual punishment because it is excessive and more severe than necessary to serve legitimate state interests;

(3) Imposition of the death penalty denies equal protection because it is arbitrarily applied by the prosecutor at the charging phase and because there is disparate geographical distribution of death cases;

(4) R.C. 2929.03 fails to provide a meaningful basis for distinguishing between life and death sentences because the jury is not required to specifically state its reasons for recommending life, or the mitigating factors found;

(6) Ohio's statutory scheme fails to assure adequate appellate analysis of excessiveness and disproportionality of death sentences;

(7) The death statutes deny due process and are cruel and unusual since they permit a death sentence on guilt found beyond a reasonable doubt rather than beyond all doubt;

(9) R.C. 2929.022, 2929.03 and 2929.04 deny effective assistance of counsel and an impartial jury because (a) the trial is bifurcated;

(15) R.C. 2903.01(B) and 2929.04(A)(7) violate due process and equal protection because they fail to specifically require premeditation and deliberation as the culpable mental state for defendants in a capital case; and

(16) R.C. 2929.03 and 2929.04 violate due process and equal protection in providing harsher treatment of defendants convicted of felony murder than those convicted of premeditated murder.

The foregoing questions were addressed and overruled in *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, certiorari denied (1985), ____ U.S. ____, 87 L. Ed. 2d 643. The remaining issues we address below.

In issue 5 appellant contends that R.C. 2929.03, 2929.04 and 2929.05 fail to require the jury to decide the appropriateness of the death penalty.

Appellant's argument that the jury does not decide the appropriateness of the death penalty is not well-taken, and ignores the mandate to the jury clearly set forth in R.C. 2929.03. In Ohio, the appropriateness of imposing the death penalty in a given case is determined by weighing the aggravating circumstances against any factors which would serve to mitigate the commission of a crime. Only where it is determined, beyond a reasonable doubt, that the aggravating factors outweigh the mitigating factors may a defendant be sentenced to death. In a case tried before a jury, R.C. 2929.03 assigns this weighing task to both the judge *and the jury*. Following independent deliberations, the jury and judge are required to come to separate conclusions regarding whether life imprisonment or death is the appropriate sentence in the case.

Appellant maintains, however, that because the jury's deliberations are not memorialized in writing, objective appellate review of appropriateness is not possible. We disagree. As we concluded in *Jenkins, supra,* at 177, such written findings are not an "indispensible ingredient" in assisting appellate courts in determining whether the death sentence was arbitrarily or capriciously imposed. Additionally, while the jury is not required to do so, pursuant to R.C. 2929.03(F) the trial judge must make specific written findings as to both aggravating and mitigating circumstances including a weight evaluation. As such, these findings serve to enhance the record available upon appellate review. In addition, the statutory requirement that the appellate court make an independent determination of sentence appropriateness is an additional safeguard against arbitrary imposition of the death penalty and is not merely the answer to a constitutional mandate of proportionality review. Issue 5 is not well-taken.

In issue 8 appellant says that the death statutes deny due process and equal protection and are cruel and unusual by requiring proof of only the aggravating factors at the guilt stage thus creating a presumptive bias in favor of the aggravating factors over any mitigating factors, and by not genuinely narrowing the class of felony murders since R.C. 2929.04(A)(7) merely repeats the definition of felony murder.

It is appellant's contention that requiring proof of only the aggravating factors at the guilt phase creates an unconstitutional bias in favor of these factors at the sentencing phase. We do not agree. First we note that whether Ohio's sentencing statute is one of many or one of only a few which require proof of the aggravating factors at the guilt stage does not determine its constitutionality. See *Jenkins, supra,* at 174, and *Spaziano* v. *Florida* (1984), ____ U.S. ____, 82 L. Ed. 2d 340, 355, where the court ruled that "[t]he Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters, over how best to administer its criminal laws." We agree with the court of appeals' finding that no presumptive bias is created in favor of the aggravating factors by requiring their proof beyond a reasonable doubt in the guilt phase. Whether a sentencing phase is needed at all rests upon this predetermination. Accordingly, this issue is overruled.

The appellant further argues that there is no genuine narrowing of the class of felony murders as is constitutionally required since R.C. 2929.04(A)(7), merely repeats the definition of felony murder. We disagree. As noted by the appellate court, "R.C. § 2929.04(A) narrows the class of felony murders subject to the death penalty by excluding those who commit arson, robbery, burglary or escape, unless they are charged with a different aggravating circumstance." We find no merit in this contention.

In issues 9(b) and (c) appellant argues that R.C. 2929.022, 2929.03 and 2929.04 deny effective assistance of counsel and an impartial jury because

the mental examination results are made available to all parties including the judge and jury, and Crim. R. 11(C)(3) encourages guilty pleas by allowing the court to dismiss the specifications only if a guilty plea or plea of no contest is accepted.

As properly noted by the appellate court, the defendant decides whether to expose himself to the risk of potentially incriminating presentence investigations, including mental examinations. There is no constitutional infirmity in providing the defendant with such an option. Additionally, the jury should be privy to all information relevant to its task of deciding whether a defendant should be sentenced to life in prison or whether it should recommend that the defendant be put to death.

Likewise, we reject appellant's contention that Crim. R. 11(C)(3) may encourage guilty pleas, and thereby a waiver of fundamental rights. Crim. R. 11(C)(3) is applicable only in cases where there has been an accepted plea to the charge and specifications. In this case, there was no plea offered or accepted. Even in cases where a plea has been accepted, Crim. R. 11(C)(3) may provide no advantage at all.

This court held in *State* v. *Nabozny* (1978), 54 Ohio St. 2d 195 [8 O.O.3d 181], paragraph one of the syllabus, that:

"The discretion given to the trial judge in Crim. R. 11(C)(3) to dismiss the specifications 'in the interests of justice' when the defendant enters a plea of guilty or no contest to the charge of aggravated murder is neither violative of defendant's constitutional right to equal protection of the laws nor does it coerce the defendant to waive his constitutional right to a jury trial."

In *State* v. *Weind* (1977), 50 Ohio St. 2d 224, at 229 [4 O.O.3d 413], we held that:

"* * * [A] defendant, even if he pleads guilty or no contest, is not assured that any or all of the specifications contained in his indictment will be dismissed, since the court *may* dismiss such specification in the 'interests of justice.' * * *" (Emphasis *sic*.)

Finally, appellant contends that Crim. R. 11(C)(3) violates the pronouncements of *United States* v. *Jackson* (1968), 390 U.S. 570.

In *Jackson,* the court held that a procedure which permitted a defendant to plead guilty, and thereby avoid a sentence of death, was constitutionally impermissible. Since, in Ohio, a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial, Crim. R. 11(C)(3) does not violate *Jackson.* Thus, we reject this contention of appellant and, accordingly, this issue is overruled.

In issue 10 appellant urges that R.C. 2945.25(C) denies an impartial jury by failing to provide an alternative challenge for cause for any juror irrevocably committed to the death penalty even where there is evidence that mitigation outweighs aggravation.

Relying upon *Witherspoon* v. *Illinois* (1968), 391 U.S. 510 [46 O.O.2d 368], this court originally addressed the converse of appellant's claim in

*Jenkins, supra,* at 179. In *State* v. *Rogers* (1985), 17 Ohio St. 3d 174, at 177, this court, again, addressed this issue by applying the modified standard of *Witherspoon* as set forth by the United States Supreme Court in *Wainwright* v. *Witt* (1985), ____ U.S. ____, 83 L. Ed. 2d 841, to wit:

"* * * [T]he proper standard for determining when a prospective juror in a capital case may be excluded for cause because of his views of capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath * * *."

Although R.C. 2945.25(C) does not provide an alternative challenge for cause for such a juror, R.C. 2945.25(O) would allow, if found appropriate, a challenge for cause in such a case in light of *Wainwright.* Accordingly, we find appellant's argument without merit.

In issue 11 appellant contends that R.C. 2929.03(D)(2) fails to provide the jury with adequate guidelines for weighing the aggravating and mitigating circumstances, that the mitigating factors contained in R.C. 2929.04(B)(1) through (6) are unconstitutionally vague, and that R.C. 2929.04(B)(7) does not insure individualized sentencing since it permits consideration of "anything."

Appellant initially takes exception to the language of R.C. 2929.03(D)(2) which requires the jury to determine whether aggravating circumstances "outweigh" mitigating factors and, if so, to recommend death. He contends that the use of the word "outweigh" implies a lesser standard of proof, *i.e.,* preponderance of the evidence. There is no merit to this challenge as the same paragraph of the statute explicitly requires the jury to find "by proof beyond a reasonable doubt" that the aggravating circumstances outweigh the mitigating ones. Absent such a showing, the jury must recommend a life sentence.

Next, in support of his contention regarding the lack of adequate guidelines, appellant unfavorably compares Ohio sentencing statutes to Florida's, and contends that although Florida's sentencing system withstood constitutional challenge in *Barclay* v. *Florida* (1983), 463 U.S. 939, it did so only because Florida has provided the jury with directives regarding the weighing process in its case law. The Florida statute provides in part:

"(2) *Advisory sentence by the jury.*—After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:

"(a) Whether sufficient aggravating circumstances exist as enumerated in subsection (5);

"(b) Whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist; and

"(c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death." Fla. Stat. Ann. 921.141(2) (1985).

R.C. 2929.03(D)(2) reads in part:

"Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment."

We see no real difference in the statutes or in the tasks they impose upon the jury and appellant fails to demonstrate his point by presenting any supporting case law.

In fact, when addressing the guidelines issue regarding the weighing process under Florida law in *Proffitt* v. *Florida* (1976), 428 U.S. 242, the United States Supreme Court stated at 258:

"The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones."

We think this is equally applicable to the Ohio law.

Additionally, in assessing the constitutionality of Florida's statute in light of the requirement of *Furman* v. *Georgia* (1972), 408 U.S. 238, the court in *Proffitt* also stated at 258:

"'* * * While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.

"'* * * [T]he trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed." See, also, *Jenkins, supra,* at 171-173.

Since the jury is required to evaluate specific factors and weigh them in like fashion in this state, the requirements of *Furman* are equally met by the Ohio law.

Appellant's next contention is that the absence of definitions renders R.C. 2929.04(B)(1) through (6) unconstitutionally vague. We disagree. These factors, set out as they are in short narratives, are explicit enough to require no further illumination.

We also reject appellant's contention that R.C 2929.04(B)(7) does not insure individualized sentences. Although the sentencing authority can consider "other factors," these factors are limited to those "that are relevant to the issue of whether the [individual] offender should be sentenced to death." This so-called "catchall" is in furtherance of R.C. 2929.04(C) which is to provide the defendant with great latitude in presenting evidence of any relevant mitigating factors.

In issue 12 appellant says that R.C. 2929.03, 2929.04 and 2929.05 are unconstitutional because they permit the imposition of the death penalty despite the existence of mitigating circumstances.

First, we note that in this case the defendant failed to present to the court any circumstances which mitigated his actions, and none were found. In addition, as noted above, Florida's statutes have passed constitutional muster even though they allow the sentencer to recommend death where mitigating circumstances exist, provided they are outweighed by aggravating factors. See *Barclay, supra,* and *Proffitt, supra.* The determination in Ohio is the same. This issue is overruled.

In issue 13 appellant argues that R.C. 2929.03, 2929.04 and 2929.05 are unconstitutional because there is no option to recommend life when there are no mitigating circumstances.

While we agree with appellant that mandatory death sentences are unconstitutional, *Woodson* v. *North Carolina* (1976), 428 U.S. 280, we reject the appellant's argument that *Barclay* must be read to imply that the jury must always have a life option even when no mitigating factors exist. In fact, the life sentence recommended by the jury was rejected by the court in *Barclay* in the absence of factors in mitigation of the crime. Again, the similarity of the Florida and Ohio statutes causes us to join the appellate court in overruling this contention.

In issue 14 appellant maintains that the specification in the first two counts of appellant's indictments are unconstitutionally overbroad and vague and are violative of equal protection since kidnapping is inherent in any aggravated murder, are double jeopardy since appellant's single act both convicts and aggravates, and that the statutes do not make mitigating factors available to one who pleads not guilty.

We disagree with the appellant's contention that kidnapping is inherent in any aggravated murder and, as such, the murder charges and their specifications relate to but a single act. In *State* v. *Moss* (1982), 69 Ohio St. 2d 515 [23 O.O.3d 447], this court construed R.C. 2941.25, the state's multiple-count statute, and stated at 519:

"The General Assembly then has authorized trial courts, in a single criminal proceeding, to convict and to sentence a defendant for two or more offenses, having as their genesis the same criminal conduct or transaction, provided that the offenses (1) were not allied and of similar import, (2) were committed separately or (3) were committed with a separate animus as to each offense. * * *"

In *State* v. *Logan* (1979), 60 Ohio St. 2d 126 [14 O.O.3d 373], this court stated:

"* * * [I]n order for two crimes to constitute allied offenses of similar import, there must be a recognized similarity between the elements of the crimes committed [and] [t]he offenses and their elements must correspond to such a degree that *commission of the one offense will result in the commission of the other.*" (Emphasis added.)

The significant movement and restraint of the victim in this case was not intrinsic to her murder. Appellant's abduction and restraint of Krista was more than a mere incidental feature of his murdering her and constituted a separate and distinct act which aggravated the circumstances of her death. Additionally, and contrary to appellant's contention, the kidnapping specifications to the murder counts do narrow the class of those eligible for the death penalty in that they require additional behavior on the part of the offender subject to death. See, also, *Jurek* v. *Texas* (1976), 428 U.S. 262, where the court upheld a Texas statute providing for death for the commission of murder during a kidnapping.

Appellant also maintains that since mitigating factors relate only to the commission of a crime, a person pleading not guilty is denied due process since there are no mitigating factors to be asserted. However, R.C. 2929.04(B)(7) and (C) allow any defendant the opportunity to offer any factors that are relevant to the imposition of the death sentence, and accord the defendant great latitude in doing so.

The proclamation of innocence is a factor relevant to the issue of whether the sentence of death should be imposed and as such can be asserted by a defendant along with any other relevant factors.

This contention is also overruled.

## V

Having addressed those constitutional issues raised by the appellant, *sua sponte* we examine the constitutionality of the imposition of the death penalty in this case in light of the Supreme Court's recent decision in *Caldwell* v. *Mississippi* (1985), ____ U.S. ____, 86 L. Ed. 2d 231.

In *Caldwell*, the petitioner killed the owner of a small grocery store in the course of a robbery and was convicted of capital murder. During the sentencing phase of the trial, petitioner's lawyer made an impassioned plea for mercy, stressing to the jurors the awesome nature of their life or death decision. In rebuttal, the prosecutor sought to diminish the jurors' sense of responsibility by assuring them that their decision was not final because it was automatically reviewable by the state's Supreme Court. The prosecutor's remarks were buttressed by comments from the trial judge regarding the reviewable nature of the jury's verdict. The jury sentenced the petitioner to death.

On appeal, the Mississippi Supreme Court unanimously affirmed the conviction but upheld the sentence of death by only a four to four vote. *Caldwell* v. *State* (Miss. 1983), 443 So. 2d 806. Rejecting petitioner's argument that the prosecutor's remarks violated the Eighth Amendment, the prevailing opinion of that court, on authority of *California* v. *Ramos* (1983), 463 U.S. 992, was that: "[S]tates may decide whether it is error to mention to jurors the matter of appellate review * * *." *Caldwell* v. *State, supra,* at 813.

In vacating the death penalty, the United States Supreme Court held that:

"* * * [I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe, as the jury was in this case, that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell* v. *Mississippi, supra,* at 239.

The court, at 239, quoting *Ramos, supra,* at 998-999, reiterated that under the Eighth Amendment "* * * 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.' "

Continuing, at 240, the court said that: "* * * the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case' " can only be met where there is assurance that the sentencers treat their power to determine the appropriateness of death as an "awesome responsibility." (Quoting *Woodson* v. *North Carolina, supra,* at 305.)

The court concluded at 244 that the inaccurate and misleading statements of the prosecutor violated the defendant's constitutional rights because the statements "* * * urged the jurors to view themselves as taking only a preliminary step toward the actual determination of the appropriateness of death — a determination which would eventually be made by others and for which the jury was not responsible. * * *"

Although the effects of the prosecutorial remarks were held, by the United States Supreme Court, to be unconstitutional in *Caldwell,* Justice O'Connor noted in her concurring opinion at 248 that *Ramos,* relied upon by the other four justices in the plurality, does not "suggest that the Federal Constitution prohibits the giving of accurate instructions regarding postsentencing procedures."

In the case at bar, the following instructions to the jury regarding their role in the sentencing process are relevant:

"A jury recommendation to the Court that the death penalty be imposed is just that. A recommendation. And it is not binding upon the Court. The final decision as to whether the defendant will be sentenced to death or to life imprisonment will be made by me, the Judge, after following the procedure and applying the criteria set forth in the statutes."

Initially we noted that while the jury has the power to impose the

sentence of death under the Mississippi statute,[9] R.C. 2929.03(D)(3) delegates the death sentencing responsibility to the trial court upon its separate and independent finding that the aggravating factors outweigh the mitigating factors in this case. The appellant herein has not alleged, nor does the record in any way reflect, that the trial court was unmindful of the awesome nature of its responsibility in imposing the death penalty.

Secondly, as noted in Part III, *supra,* Ohio's multi-leveled appellate review of the trial court's written findings justifying imposition of death serve as an additional safeguard against capriciousness or unjust bias.

Finally, unlike the comments to the jury in *Caldwell* v. *State, supra,* the instructions given to the jury in this case are an accurate statement of the law in Ohio. R.C. 2929.03(D)(2) provides:

"* * * If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender. was found guilty of committing outweigh the mitigating factors, *the trial jury shall recommend to the court that the sentence of death be imposed on the offender. * * *"* (Emphasis added.)

As we stated in *Jenkins, supra,* at 202, and we now emphatically emphasize, the better procedure would be to have no comment by the prosecutor or by the trial judge on the question of who bears the ultimate responsibility for determining the penalty. Nevertheless, in the case at bar, the charge of the trial court was not inaccurate or misleading, nor was its effect upon the jury constitutionally infirm. Thus, we find that *Caldwell* v. *Mississippi, supra,* is clearly distinguishable from the matter now before us.

In conclusion, we find that the death sentence imposed in this case is appropriate in light of the existence of the aggravating circumstances and the absence of any factors in mitigation of this horrible crime. Additionally, we find the sentence of death to be appropriate as it is neither excessive nor disproportionate to the penalty imposed in similar cases. Finally, convinced as we are that the appellant has received objective, impartial and unbiased review on appeal, we affirm both the conviction and the death sentence. Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

CELEBREZZE, C.J., SWEENEY, LOCHER and HOLMES, JJ., concur.

CONNORS and WRIGHT, JJ., dissent.

---

[9] See Miss. Code 1972 Ann. Section 99-19-101(1) and (2) (Supp. 1985). See, also, *Williams* v. *State* (Miss. 1984), 445 So. 2d 798, where the Supreme Court of Mississippi stated at 811:

"The structure of the capital sentencing system enacted by our Legislature places the entire sentencing burden on the jury. No judge or other official within our system has the power to impose the sentence of death; *only the jury.*" (Emphasis added.)

CONNORS, J., of the Sixth Appellate District, sitting for C. Brown, J.

CONNORS, J. I must respectfully dissent.

At the outset, this court, pursuant to a mandatory provision of the statute, is called upon to review a sentence of death imposed upon defendant-appellant for the kidnapping, felonious sexual penetration and murder of a young girl. There is no question but that a heinous crime was committed, but a reviewing court must never let that fact interfere with the due process protections of law afforded an accused.

As reflected in the majority opinion, eyewitness identification of appellant was hazy, inconsistent, and contrary. Photo identification was not positively made and, in fact, two of the state's prime witnesses who later testified at trial had, shortly after the crime was committed, picked another suspect out of a valid photo array, and a third could not make a selection.

Months later appellant was arrested in Summit County and charged with unrelated offenses and was pictured in news releases and broadcast reports. Subsequently, yet another witness, after viewing on television and in newspaper photos, came forward to the Wayne County Sheriff's Department to tell it that she believed appellant was a spectator at a softball game one week before the victim was abducted. As far as identification was concerned, that was the totality of it at the time appellant was arrested and charged with these offenses.

Appellant's first proposition of law is:

"Where the evidence regarding an identification raises reasonable doubts as to its accuracy, and such identification is crucial to a closely balanced prosecution, expert testimony on eyewitness identification is admissible under *Evidence Rule 702* so long as (1) the expert is qualified, (2) the subject is proper, (3) the testimony conforms to a generally accepted explanatory theory, and (4) the probative value outweighs the prejudicial effect."

In support of this proposition, appellant argues as follows:

"During the course of this lengthy trial, the prosecution presented the testimony of two eyewitnesses to the abduction of Krista Harrison from the park in Marshallville; the testimony of three eyewitnesses, who claimed to have seen defendant in that same one week before the abduction; and one remaining eyewitness, who testified that he saw defendant at the location that Harrison's body was discarded. At first blush, this general review of eyewitness testimony would seem to present substantial evidence. However, closer inspection reveals that the circumstances accompanying the initial observation, considered in light of the circumstances that existed before, during and after the police identifications, created an atmosphere of suggestibility, which in fairness demanded expert testimony concerning its reliability.

"In the court's review of the proposition urged, two general facts should remain in mind. *First, no witness identified defendant until after he or she first saw Buell on television or front page newspaper publications associating him with the murder of Krista Harrison. Second, the only two witnesses who observed the kidnapping identified someone other than Buell.* The unusual fact situation surrounding the identification procedures in this case undoubtedly led to this result, and for this reason, as we shall see, due process commanded the admission of Dr. Penrod's testimony.

"Mildred Butzer testified at the hearing to suppress the in-court identification, as well as the trial. She related that she was present at a baseball game in Marshallville, Ohio, on Friday, July 9, 1982, which was one week before the date of the crime alleged in the indictment. Krista Harrison was the pitcher that evening. While in her position as third base coach, she had a brief discussion with a spectator, who was sitting behind her. Her memory of the few words spoken, she described as vivid. The conversation was in a normal tone of voice and lasted less than fifteen seconds. She determined from this brief observation, that she did not know him. The event was so insignificant in her mind that she spoke with no one about it after the game.

"It was not until October or November of 1983, some sixteen months later, that her attention was again directed to the incident, and the person sitting in the grass. At that time, she saw him on television and on the front page of the newspaper in accounts relating to Mr. Buell [and] to the death of Krista Harrison. It was only after a one and one-half year lapse, and this publicity, that the event became important in her mind.

"Thereupon, Mrs. Butzer called the Wayne County Sheriff's office. Shortly thereafter, she called Corliss Archie, another witness at the ballfield, to tell her what she had seen on T.V. and in the news, and that she had already called the sheriff. She asked her to watch the news to see if he looked like the man at the ballfield. She was shown sketch composites of the suspect that she didn't feel looked anything like the man at the ballfield.

"With this background, Mildred Butzer identified Robert Buell as being the spectator at the game.

"Corliss Archie was the second of three witnesses from the ballfield called by the prosecution at both the motion to suppress and trial. She recounted, through testimony, that she witnessed the encounter between the spectator and Mildred Butzer, although her recollection of the details differed. She described the interaction, between the spectator and Mrs. Butzer, as an argument, during which the parties were 'hollering' or 'yelling' at one another. She was absolutely sure that Butzer yelled out, 'who are you?' and 'What do you want and if your [sic] not a parent why don't you just get out of here?', although Mildred Butzer did not remember such in vivid recollection. She further recalled, that the conversation was approximately three minutes, not fifteen seconds and the spectator was squatting, not standing.

"When requested by Mildred Butzer, she observed the spectator for approximately thirty seconds to see if he was a parent or she knew him. He was not a parent and she did not know him. She then walked to a lawn chair, where a third coach, Claudia Casey, was seated, to see if she knew him, but the man in question was gone by the time she arrived at Casey's chair.

"It was not until November of 1983, some sixteen months later, that her attention was again directed to the incident and the person squatting in the grass. The event was so insignificant that she mentioned it to no one in the interim. In November, she received a call from Mildred Butzer, who informed her that a Robert Buell had been arrested in Summit County, for the abduction and rape of two women, and he would be on T.V. that evening. She further told Mrs. Archie to see if he looked like the man at the ballfield, and if he did to call the Wayne County Sheriff. She further told Corliss that she had already been to the Sheriff's office and identified Buell as the spectator at the game.

"Mrs. Archie watched the T.V. reports and read the newspaper accounts of Mr. Buell's arrest, all of which associated him with the death of Krista Harrison. About two days later, she was shown a series of photos from which she picked Buell.

"With this background, Corliss Archie identified Robert Buell, as being the spectator at that game.

"The third and final witness from the ballfield was Claudia Casey, called by the prosecution at the hearing on the motion to suppress, as well as at the trial. She also testified that she had witnessed the encounter at the baseball game, although her recollection of the details differed from that related by both Butzer and Archie. She described the exchange between Mildred Butzer and the fan as yelling, unlike the description by the participant, Mildred Butzer. She recalled Butzer responding, 'What do you want? Blood?'; a memory different from either of the other witnesses. Her testimony described the man as standing, not sitting or squatting, as she observed him from her position on the player's bench, not in a lawn chair as related by Corliss Archie and Mildred Butzer.

"Following the verbal exchange between Butzer and the spectator, she recalled that Corliss Archie approached her, where she was seated, and asked her if she knew the man. She viewed the man for approximately thirty seconds, a modification of the one minute estimate she gave at the motion hearing. She didn't recognize him. It should be remembered that Corliss Archie testified that when she arrived at Claudia Casey's lawn chair, the troublesome spectator was already gone.

"It was not until the end of October of 1983, some sixteen months later that her attention was again directed to the incident and the person standing in the grass. At that time, Corliss Archie called her and explained that the Wayne County Sheriff would probably contact her about the man arrested in Summit County, because the police thought there may be a link between him, the man at the ball diamond and Krista. She had already

heard about Buell, and although she didn't recall seeing news and T.V. photos of Buell, it was very possible she did.

"She insisted that she positively identified Buell from a photographic array, despite the fact that Detective Augenstein, who had shown her the array, testified that she responded that she was not sure, because she 'did not see the subject who [sic] they were arguing with very clearly.'

"With this background, Claudia Casey identified Robert Buell as being the spectator at that game.

"Of the remaining three eyewitnesses, one was Donald J. Middleton, who testified at the hearing on defendant's motion to suppress the in-court identifications as well as at the trial. He related an incident, which occurred on a Friday in July of 1982, which was more particularly described by officers involved as July 23, 1982 one week after the abduction of Krista Harrison. While traveling down a route known as Calico Road in Holmes County, Ohio, he encountered an abandoned shed along the roadway, with an automobile parked along its side, and a man standing between the car and the shed. He lost site [sic] of the man as he approached, because of a grade in the road. By the time Middleton regained his view, the man was in the car driving toward him. As he approached and then passed in his automobile, he looked up, waived [sic], and smiled. His total viewing time was three to four seconds. It was later that same day that Middleton learned that Krista Harrison's body had been found by that shed.

"Unlike Butzer, Archie and Casey, who were not asked by police at the time for a description of the man they saw at the ballfield, Middleton gave police a description of the man he had seen, which included the age of twenty-five to thirty years and a gap between his teeth; two important details, which did not correspond to the defendant, who was admittedly forty-three years old without a space between his two front teeth. He also provided a description to a Holmes County Sheriff's Deputy, who sketched a composite, which Middleton admitted looked nothing like Buell.

"Middleton was called upon at least two times by police to identify a suspect from a photographic array. The first time was approximately one and one-half years before the trial, close to the date of his observation, but before Buell was an arrested suspect. He remembers selecting one photo as looking like the man, but later learned that Buell's photo was not included in the array. He further testified that the second time he saw photographs occurred after Buell had been arrested, and he had seen him on T.V. and in the newspaper associated with the kidnap-murder of Krista Harrison. According to the testimony, he was shown three photographs; one of Buell, one of a car, and one of a van.

"Detective Augenstein admitted that he was at Middleton's home on two separate occasions to show him photographic arrays. His trained memory of the results was substantially different than Middleton's. According to Augenstein, he selected no one from the first array, which did

not include Buell's photo, and on the second occasion, said only that the photograph of Buell 'was as close as anyone he'd seen', or 'this looks as much like that man as anybody else I've seen.'

"Perhaps, most devasting to any suggestion of Middleton's identification reliability was his inability to select Detective Augenstein from the courtroom audience at the time of the motion hearing, even though he was pointed out by defense counsel. Nor could he identify Augenstein at the trial, even though Middleton admits that he was within his home for at least ten or fifteen minutes on two separate occasions.

"With this background, Donald Middleton identified Robert Buell as being the man who drove that car on Calico Road [near the scene of the crime].

"The remaining two witnesses were present at the scene of the kidnapping and testified only at the trial. Stephanie Baker was visiting her father in Marshallville. While walking in the vicinity of the park, she was approached by a man in a dark brown van in such a manner that it scared her. She then witnessed the van drive away and enter the entrance to the park, where the bleachers for the ballfield were located. She gave a description to the police of the man and a composite drawing was prepared with her assistance.

"Baker was shown a photographic array before Buell's arrest, which did not include his picture, and she selected two photos as being the driver of the van, but could not decide which. After Buell's arrest, she was again shown an array which did include Buell's photo, but she was unable to make any identification. When asked to personally view the defendant in court, she could not identify him as the driver of the van.

"Roy Wilson is the final eyewitness, who also appeared only at the trial. He was with the victim in the park and witnessed her abduction. He described a maroon-red van pulling up to their location and a man exiting. He thereafter forced the victim into the van and pulled away. He described the van and the driver, but was never asked by the prosecution if he could identify Buell.

"Wilson recalled assisting police in the preparation of a composite from his description, identified as defendant's Exhibit No. 1, which he testified looked like the kidnapper. He assisted a sketch artist, a few days later in the preparation of a second composite identified as defendant's Exhibit 2, which he also testified looked like the kidnapper. Each depicts a young long haired man.

"He was also shown a photographic array by the police, sometime in July or August of 1982, and selected the photo of a young man with long hair and a mustache, at a time before Buell was a suspect.

"He concluded his testimony by telling the defense counsel on cross-examination, and the prosecutor on redirect examination, that he had seen Buell on a T.V. newsreel within the few days before his testimony and

Buell 'was not the man' and 'didn't look like' the suspect who drove the van.

"* * *

"With this background, the defense offered to introduce the testimony of Dr. Steven Penrod, to present expert testimony concerning the reliability of eyewitness identification generally, and the reliability of the eyewitness identifications under the peculiar circumstances of this case. The court refused to permit Dr. Penrod's testimony, citing the ability of the jury to assess the credibility of the witnesses based on the instructions provided in the charge. At that point, the expert's testimony was proffered for review by the appellate courts.

"In its argument against the introduction of Dr. Penrod's testimony, the prosecution cited *State* v. *Sims* [(1981), 3 Ohio App. 3d 321] for the proposition that such expert testimony is inadmissible. Specifically, the court held in headnote two:

" 'The expert testimony of an experimental psychologist concerning the statistical likelihood of eyewitnesses to observe and recall accurately the details of a crime is not admissible, on the ground that such testimony does not assist the trier of fact to determine the facts in the case before it. The expert testimony of an experimental psychologist, on the issue of whether a particular eyewitness was testifying accurately is likewise inadmissible in the absence of any evidence that the witness suffers from a mental or physical impairment which would affect the witness' ability to observe or recal [*sic*] events.'

"Despite this language, it's appellant's belief that the court's holding should be limited to the particular facts of that case. The circumstances presented therein were inappropriate for such an expert's analysis, because there existed overwhelming corroboration for the identification testimony. The witness in question was the victim of a robbery who:

"1. Instantly recognized defendant as someone who had patronized the store sixty or seventy times within the three months preceding the robbery.

"2. She recognized his voice and his habit of calling her 'baby.'

"3. She recognized his clothing, which included a distinctive orange skullcap that he always wore.

"4. She recognized the co-defendant as a man, who had accompanied the defendant in the store on ten or fifteen previous occasions.

"5. The suspect was in the store with her for three to four minutes.

"6. She knew the residential building in which he lived near the store.

"7. She told her daughter, immediately after the robbery, that she knew the robber, but simply did not know his name.

"8. Defendant fled the store to the high rise building, where the witness knew he lived.

"9. Within three days of the robbery, the witness had selected defendant's photo from an array.

"Obviously, no similarity exists between the instant fact pattern and the one just reviewed. Except for the eyewitnesses who could not identify defendant, i.e. Wilson and Baker, no witness observed the suspect for a period in excess of thirty seconds; nor identified sooner than sixteen months after their observation; nor identified defendant until they had seen appellant on television and the wrong page of the newspaper in stories associating him with the kidnap-murder of Krista Harrison. These circumstances were so unusual and suspicious that fairness and due process compelled the introduction of expert testimony as it related to the impact, or effect, such circumstances had upon the witnesses' identification.

"The court in *Sims, supra,* at p. 325, noted that the expert summoned on behalf of defendant rendered an opinion on the probabilities of the witness making an accurate identification, but was admittedly unaware that she had seen defendant in her store on sixty to seventy earlier occasions, or that she had immediately told police she knew who her assailant was. Once again, such factors are not present herein. Dr. Penrod specifically testified that he had:

"1. Studied the testimony of Augenstein, Middleton, Butzer, Archie, and Casey rendered upon the motion to suppress; and

"2. Reviewed the basic information and the testimony of these same witnesses at trial with their motion testimony; and

"3. Received and reviewed copies of the photographic arrays viewed by these witnesses.

"The court herein has before it, the record of the testimony rendered upon defendant's motion to suppress and a detailed review confirms the substantial correlation between the eyewitnesses' motion and trial testimony. Therefore, no issue is presented to suggest that Dr. Penrod's testimony and opinions were rendered, without benefit of the facts in issue.

"Finally, the defense in the *Sims* case was apparently unable to present reliable data that such testimony has flourished throughout the judicial system in this country, for the court recites[:]

" 'There are numerous decisions by American courts in which expert testimony regarding the credibility of witnesses has been received. * * * All of these cases, however, involved allegations that the witness suffered from an organic illness, a psychiatric disorder, or a mental impairment, which would diminish the witness' ability to accurately perceive, remember, or relate the events testified to.' *State* v. *Sims, supra,* at p. 325." (References to record and other material deleted; appellant's brief at 1-13.)

The appellant then cites *State* v. *Barnett,* Montgomery C.P. No. 80CR1953, unreported; *State* v. *Alford,* Montgomery C.P. No. 83CR2225, unreported; *State* v. *Jones,* Montgomery C.P. No. 78CR448, unreported; *United States* v. *Smith* (C.A. 6, 1984), 736 F. 2d 1103; *United States* v. *Downing* (C.A. 3, 1985), 753 F. 2d 1224; *State* v. *Chapple* (1983), 135 Ariz.

281, 660 P. 2d 1208; *State* v. *Contreras* (Alaska App. 1983), 674 P. 2d 792; *People* v. *McDonald* (1984), 37 Cal. 3d 351, 208 Cal. Rptr. 236, 690 P. 2d 709; *Lindberg* v. *Leatham Bros., Inc.* (Mont. 1985), 693 P. 2d 1234; and *State* v. *Sellars* (1981), 52 N.C. App. 520, 278 S.E. 2d 907. All the above-cited cases approved the testimony of an expert on factors influencing eyewitness identification.

The majority relies heavily on *State* v. *Sims, supra. Sims* is clearly distinguishable. The factors presented in that case, *i.e.,* improper subject, expert's lack of familiarity with the facts, and no precedent, are not present herein. There is, therefore, no valid reason for it to control in this case.

Evid. R. 403 concerns itself with probative value compared to prejudicial effect. It, in part, provides as follows:

"(A) *Exclusion Mandatory*. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

In *United States* v. *Brady* (C.A. 6, 1979), 595 F. 2d 359, 361, the court applying and giving its rationale for the corresponding federal rule, said, "we must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect."

The United States Supreme Court said, in *United States* v. *Wade* (1967), 388 U.S. 218, 228, that "the annals of criminal law are rife with instances of mistaken identification."

Evid. R. 702 is referred to and cited in the majority opinion. As I view the rule, the application thereof is most apropos in the case *sub judice.* There is no question, in this writer's opinion, that the testimony of the expert witness which was not permitted to be heard by the jury, in view of the inconsistencies of the state's identification witnesses at trial, would have assisted the jury (the very purpose of Evid. R. 702) in assessing the weight to be given to the testimony of each individual witness.

When we also consider that the prosecution's case consisted of two basic theories, *i.e.,* eyewitness identifications and carpet fiber comparisons, and that the prosecution's experts regarding the latter theory could not establish a conclusive link to appellant, it was an abuse of discretion to refuse relevant and valuable expert testimony on the reliability of such identification particularly when the stakes are a human life.

I find appellant's first proposition of law well-taken, would reverse and remand the cause to the trial court for a new trial, with instructions to permit appellant's counsel to call as a witness the expert whose testimony was prejudicially excluded.

WRIGHT, J., dissenting. I hold the strongest reservations about the admissibility of the state's expert witness' testimony that "* * * fibers from the bedspread [blanket] came from Mr. Buell's carpeting."

The witness, Alan T. Robillard, had expertise in microscopic and micro-chemical analysis, not in statistics. He testified that his fiber

analysis indicated that the blanket fibers could have originated from the carpet samples from Buell's van or house. This testimony was perfectly appropriate, given the expert's qualifications. See *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, 111 [2 O.O.3d 249]. However, he also stated: "* * * I can't say and never will be able to say positively that those fibers originated from his [Buell's] carpet." Despite this critical admission, the court allowed Robillard to subsequently testify, based on a hypothetical question involving statistical analysis, that it was "extremely likely" that the fibers were, in fact, from Buell's carpet. This testimony was not properly admissible because it required knowledge that was beyond the witness' expertise. Furthermore, the answer was not responsive to the question, which was framed in terms of a reasonable scientific certainty.

This court has carefully restricted opinion testimony in criminal cases, requiring the offer of an expert opinion to be premised upon a reasonable medical or scientific certainty or probability. See *State* v. *Holt* (1969), 17 Ohio St. 2d 81 [46 O.O.2d 408]. Today, the majority in effect discards this standard by equating a reasonable certainty or probability with something that is "extremely likely." I have previously expressed my misgivings with relaxing the expert opinion standard in civil cases. See *Oswald* v. *Connor* (1985), 16 Ohio St. 3d 38, 47 (Wright, J., dissenting). I strongly disagree with a similar relaxation in this case, which involves the most serious of all offenses: aggravated murder with death penalty specifications.

It cannot be said that Robillard's testimony was unimportant to the state's case. To the contrary, the physical evidence was crucial to Buell's conviction. This court should follow the holding in *State* v. *Holt, supra,* that it was reversible error for an expert to testify that hair samples were "likely" to be from the same source.

Because Robillard's testimony failed to meet evidentiary standards for opinion evidence in criminal cases, I respectfully dissent. I would reverse and remand the cause for a new trial.

CONNORS, J., concurs in the foregoing dissenting opinion.