### State v. Green
*[Cite as 5 AOA 21]*

Case No. C-880504
Hamilton County, (1st)
Decided July 11, 1990

*Arthur M. Ney, Jr., Prosecuting Attorney, and William E. Breyer, Esq., 420 Hamilton County Courthouse, Court and Main Streets, Cincinnati, Ohio 45202, for Plaintiff-Appellee.*

*D. Shannon Smith, Esq., 1804 Carew Tower, 441 Vine Street, Cincinnati, Ohio 45202, and Timothy A. Smith, Esq., 13 East Court Street, Cincinnati, Ohio 45202, for Defendant-Appellant.*

*Per Curiam.*

This cause came on to be heard upon the appeal, the transcript of the docket, journal entries and original papers from the Hamilton County Court of Common Pleas, the transcript of the proceedings, the assignments of error, and the briefs and arguments of counsel.

On February 3, 1988, a grand jury in Hamilton County returned an indictment in which the defendant-appellant, Elizabeth Green, was charged with three offenses:

"(1) Aggravated murder, for the purposeful killing of Tommie Willis, a seventy-year-old male, with the specification that Green committed the murder as the principal offender while she was also participating in an aggravated robbery; (2) aggravated robbery, for possessing a deadly weapon while she was committing a theft offense; and (3) felonious assault, for an unrelated incident that occurred in 1986. The charge of felonious assault was severed from the other two charges and was ultimately dismissed."

After entering a plea of not guilty, Green moved for and obtained the appointment of psychologists and other supporting experts to assist in the presentation of her defense. On June 27, 1988, her trial before a three-judge panel commenced, and three days later she was found guilty of aggravated murder and aggravated robbery as she stood charged.

The penalty phase of the proceedings commenced on July 7, 1988, and the panel concluded, with respect to the aggravated murder, that the aggravating circumstance outweighed the mitigating factors, and that death by electrocution would be the appropriate sentence. With respect to the aggravated robbery, Green was sentenced to the Ohio Reformatory for Women for a period of not less than ten actual years nor more than twenty-five years.

In the review of a death-penalty case, R.C. 2929.05 requires us to complete three tasks. After addressing each assignment of error presented by the appellant, we must independently determine whether the specified aggravating circumstances of the homicide in question outweigh the factors presented in mitigation of punishment, and then determine whether the sentence of death is appropriate, after considering whether it is excessive or disproportionate to the penalty imposed in similar cases.

Having studied the death-penalty cases in this jurisdiction as the law requires, and having reviewed the record certified to us by the trial court, we find no prejudicial error in this appeal and overrule all four of the assignments of error before us. We are further persuaded that the aggravating circumstance of Tommie Willis's homicide outweighs the mitigating factors present in this record, and that the sentence of death imposed below is appropriate.

I.

On January 4, 1988, Green left her home and proceeded to the apartment of an acquaintance, one Belinda Coulter, who was also charged in the indictment returned against Green. Apparently, the two wanted to acquire a quantity of cocaine, but neither had enough money to make such a purchase. Green, however, had a $40 book of food stamps that she was willing to sell at a reduced price. Coulter indicated that her neighbor across the street, Tommie Willis, engaged in the practice of buying food stamps. The two agreed that Coulter would sell the stamps to Willis and utilize the proceeds to purchase a small quantity of cocaine from a third party. When both transactions had been completed, and Green and Coulter had finished smoking the cocaine, the two realized that their appetite for the drug was not yet satisfied. Accordingly, they devised a plan to secure additional funds for the purchase of more cocaine.

The plan focused upon the large amount of cash Coulter had noticed in Willis's wallet on her previous visit to his residence. Green and Coulter agreed that they would go again to Willis's home under the pretense of asking him if they could buy some liquor. Once inside, they would rob him and in Green's words, "take his life." Wearing socks on their hands, the two women walked across the street to Willis's apartment and knocked on his door. Willis opened the door, and, upon hearing of their desire to purchase a half-pint of liquor, Willis allowed both women to enter.

Green and Willis went into the kitchen to retrieve the liquor while Coulter asked if she could use the telephone in an adjoining room. At some point, Willis began to suspect that he was about to be robbed and produced a knife to defend himself. Green wrestled with Willis and managed to take the knife from him; and, by her own account, while yelling for Coulter's assistance, she then stabbed Willis numerous times in the neck and chest. When Coulter came into the kitchen, she, too, proceeded to stab Willis repeatedly. After inflicting approximately one hundred wounds and thrusting a pillow into Willis's face, Coulter searched his pockets and found a large sum of cash. Prior to leaving the apartment, the women pocketed the money, took the phone off the hook, turned the television off and removed a bottle of liquor from the kitchen.

Their flight from the crime scene took the two women across the street to Coulter's residence, where they attempted to wash away and dispose of any incriminating evidence. After only three weeks, however, they became the focus of a police investigation.

Several factors drew Green and Coulter into suspicion. First, one of the suspects had left a

bloody child's sock at the crime scene, which led the police to believe that the killer or killers had children. Belinda Coulter had two children. Second, there were two distinct blood types found at the scene, which led investigators to conclude that one of the killers had been cut during the attack. When the police questioned Green, they noticed that she had a deep cut on her hand. Third, a shoe print left at the scene seemed to suggest that one of the killers was a woman and that she wore a size seven or seven and one-half shoe. Coulter wore a size seven shoe. Fourth, Coulter, who apparently was without funds prior to Willis's death, suddenly displayed a large sum of cash. On the strength of these indications of guilt, the police arrested the two women and obtained from Green a statement in which she acknowledged her involvement in the crimes.

## II.

In the first of her four assignments of error, Green asserts that she was denied her constitutional right to confront witnesses against her when the trial court restricted the cross-examination of the state's chief witness, her co-defendant Belinda Coulter. Specifically, Green claims that her right to impeach Coulter was unduly restricted by the court because it required her to stipulate to several prior inconsistent statements of Coulter. This assignment is overruled.

"The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him." *Davis v. Alaska* (1974), 415 U.S. 308, 315, 94 S. Ct. 1105, 1110. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Id.* The Sixth Amendment does not, however, prevent a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is or only marginally relevant." *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 679, 106 S.Ct. 1431, 1435. "The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 106 S. Ct. 292, 294.

In the case *sub judice*, the trial court allowed defense counsel to probe deeply into Coulter's motivations for committing the crimes and into her previous statements to police. Counsel was successful in attacking the credibility of Coulter by getting her to admit that she had lied to police when expressing her version of the events that occurred on January 4, 1988. The trial court was able to observe Coulter's demeanor and evaluate her credibility as a witness. The stipulated statements were merely repetitive and cumulative and would not have increased the effectiveness of counsel's cross-examination of Coulter. Further, unlike other cases where various areas of cross-examination were precluded by the trial court's ruling, the panel in the instant case reviewed and considered all the prior inconsistent statements that were stipulated by the defendant.

Accordingly, based on the state of this record, we conclude that the trial court did not err when it requested the defense to stipulate to all of Belinda Coulter's prior inconsistent statements. Thus, this assignment is overruled.

In her second assignment of error, Green argues that she was denied the effective assistance of counsel as a result of the stipulations challenged in the first assignment of error. Those stipulations were prejudicial, Green reasons, because the statements stipulated tended to incriminate her.

When an allegation of ineffective assistance of counsel is under consideration, a dual-pronged approach is usually employed. The inquiry is set forth in *State v. Bradley* (1989), 42 Ohio St. 3d 136, 141, 538 N.E.2d 373, 379, as follows:

"First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel ineffectiveness. *State v. Lytle* (1976), 48 Ohio St. 2d 391, 396-397, 2 O.O. 3d 495, 498, 358 N.E.2d 623, 627, vacated in part on other grounds (1978), 438 U.S. 910."

To prevail on a claim that defense counsel was ineffective, a defendant must show that counsel's representation fell below an objective standard of reasonableness. *Strickland v. Washington* (1984), 466 U.S. 668, 687-689. 104 S. Ct. 2052, 2064-65.

We are persuaded that Green has not met her burden in the instant case. It is clear that

defense counsel stipulated the various inconsistent statements of Belinda Coulter only for impeachment purposes. It is equally clear from the transcript of the proceedings that the court accepted the statements for consideration solely on that limited ground. Accordingly, we conclude that Green received competent and effective representation during her trial, and that she was not prejudiced by her attorney's obvious strategy to impeach the credibility of Coulter.

In her third assignment of error, Green maintains that the death sentence is inappropriate in this case. We reject this claim for the reasons given *infra* in the third phase of our appellate review.

In her final assignment of error, Green asserts that the trial court erred when it overruled her motion to dismiss the charges lodged against her. This claim is based on a facial challenge to the Ohio death-penalty scheme under both the United States Constitution and the Ohio Constitution.

There are twelve aspects to Green's constitutional attack, none of which, as far as this record demonstrates, were addressed to or considered by the trial court.[1] Although this permits us to invoke the waiver rule of *State v. Awan* (1986), 22 Ohio St. 3d 120, 489 N.E. 2d 277, we choose, by exercising the discretion vested in us by law, *In re M.D.* (1988), 38 Ohio St. 3d 149, 527 N.E. 2d 286, syllabus, to rule on the merits of each constitutional issue raised here for the first time:

"1. Whether the Death Penalty violates the prohibition under the 8th Amendment of the U.S. Constitution against cruel and unusual punishment;

"2. Whether the Death Penalty in Ohio is applied in arbitrary and capricious fashion since it permits prosecutors to exercise discretion in deciding who will be charged with capital offenses;

"3. Whether the Ohio Death Penalty scheme fails to require premeditation or deliberation as the culpable mental state for defendants in all capital cases;

"4. Whether O.R.C. 2923.03 sets forth no standard of proof to be applied in determining mitigating factors;

"5. Whether O.R.C. 2929.03 fails to give the jury a standard with which to balance the mitigating factors against the aggravating circumstances;

"6. Whether the consideration of aggravating circumstances at the guilt phase of the trial is unconstitutional;

"7. Whether O.R.C. 2929.03 and 2929.04 are unconstitutional in that they treat felony murders more harshly than premeditated murder;

"8. Whether the Ohio Death Penalty scheme is unconstitutional in that it does not give the sentencing authority the option to impose a life sentence, or give mercy, when it finds that the aggravating circumstances outweigh the mitigating factors;

"9. Whether the Ohio Death Penalty scheme is unconstitutional because in conjunction with Crim. R. 11(C) (3), it encourages defendants to waive their fundamental rights and enter guilty pleas;

"10. Whether the Ohio Death Penalty scheme is unconstitutional because in conjunction with Crim. R. 11(C)(3), it encourages defendants to waive their fundamental rights and enter guilty pleas;

"11. Whether the Ohio Death Penalty is unconstitutional because it is a mandatory death penalty;

"12. Whether the Ohio Death penalty is unconstitutional in that it fails to provide for adequate appellate review. Brief of Appellant at 18-21."

Green concedes that issues one through nine have been addressed and rejected as constitutional grounds for overturning the death penalty in *State v. Jenkins* (1984), 15 Ohio St. 3d 164, 473 N.E.2d 264, and *State v. Maurer* (1984), 15 Ohio St. 3d 239, 473 N.E. 2d 768. The tenth issue must be resolved against Green on the authority of *State v. Buell* (1986), 22 Ohio St. 3d 124, 489 N.E. 2d 795. The eleventh issue fails to sustain Green's challenge on the authority of *State v. Coleman* (1988), 37 Ohio St. 3d 286, 525 N.E. 2d 792. And the twelfth issue does not validate her constitutional claim on the authority of *State v. Scott* (1986), 26 Ohio St. 3d 92, 497 N.E.2d 55. The fourth assignment of error is, accordingly, without merit.

### III.

Following the mandate of R.C. 2929.05(A), we turn now to the second aspect of our appellate review and proceed with the task of weighing the aggravating circumstance of this homicide against any mitigating factors demonstrated within the record.

The aggravating circumstance relevant to our inquiry is that found to exist, as specified in the indictment, during the guilt phase of the proceedings below; there is no need to address that circumstance here, because we have provid-

ed an ample factual con-text for it in an earlier part of this decision.

The mitigating factors are those found in R.C. 2929.04(B), summarized as follows:

"1. the nature and circumstances of the offense;

"2. the history, character and background of the offender;

"3. whether the victim induced or facilitated the offense;

"4. whether the offender was under duress, coercion or strong provocation at the time of the offense;

"5. whether, at the time of the offense, the offender had a mental disease or defect that deprived him of substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the law;

"6. the youth of the offender;

"7. the offender's history of criminal convictions and delinquency adjudications;

"8. for one not a principal offender, the degree of participation in the offense and in the acts leading to the victim's death;

"9. any other factors relevant to the imposition of the death penalty."

Since Green addressed each of these factors below in presenting her case for the mitigation of punishment, our review will focus upon each factor in an attempt to determine if any one of them is applicable to the facts and circumstances of this case.

In regard to the first factor, the nature and circumstances of the offense, we find nothing of mitigating value in the record. The facts clearly demonstrate that Green brutally murdered Willis in an attempt to obtain money to satisfy her appetite for cocaine. There simply is nothing in the commission of the offense itself that would cause us to view this factor in Green's favor.

As to the second factor, the history, character and background of the offender, we are not unmindful of the disaffection produced in this young woman by a life that has become mired in instability both by abuse and by neglect, but we cannot say that this meaningfully shifts the balance, either alone or in tandem with other factors, in a way that weighs against the imposition of the death penalty.

With respect to the third, fourth, and fifth factors, there is absolutely no credible evidence in the record to support their use in mitigation of Green's punishment.

With respect to factor six, the youth of the offender, the record reflects that Green was twenty-four years old when she murdered Tommie Willis. Although there may be some mitigating value in her age, its weight, in our judgment, is negligible in comparison to the aggravating circumstance of Willis's homicide.

The seventh factor, the offender's history of criminal convictions and delinquency adjudications, does not weigh in Green's favor because she has previously been convicted of several criminal acts, including theft, drug abuse and resisting arrest.

Our conclusion is no different with respect to the eighth factor because the facts clearly demonstrate that Green was a principal offender, and that she participated purposefully in the acts that led to Willis's death.

Finally, in regard to the ninth factor, we conclude that there are no other relevant considerations to be balanced against the aggravating circumstance in this case.

Accordingly, after reviewing all the factors required by law, we hold, in sum, that the aggravating circumstance, as set forth in the death-penalty specification included in the three-judge panel's finding of guilt, outweighs, beyond a reasonable doubt, what little may be said to support the mitigation of Green's punishment.

IV.

The final phase of our review requires that we determine whether the death penalty is appropriate in this case. In carrying out this task, we must consider "whether that sentence is excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). Our examination is limited to capital prosecutions in this jurisdiction that have resulted in the imposition of the death penalty. *State v. Steffen* (1987), 31 Ohio St. 3d 111, 509 N.E. 2d 383, paragraph one of the syllabus.

Upon review of the cases decided by this court in which the death penalty has been imposed, we conclude that the sentence in the case *sub judice* is appropriate, and that it is neither excessive nor disproportionate to the penalty imposed in similar cases.

The judgment of the court of common pleas, including the sentence of death imposed for the aggravated murder of Tommie Willis, is hereby affirmed.

*Judgment affirmed.*

SHANNON, P.J., HILDEBRANDT and GORMAN, J.J.

[1] Green states here that these claims have been raised merely to preserve argument for further appeal.